[Civ. No. 37225. First Dist., Div. One. Apr. 6, 1976.]

NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.,
Plaintiffs and Appellants, v.
CALIFORNIA COASTAL ZONE CONSERVATION
COMMISSION et al., Defendants and Respondents;
SEA RANCH ASSOCIATION et al.,
Real Parties in Interest and Respondents.

**COUNSEL**

John Roger Beers and Ballard Jamieson, Jr., for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, Roderick Walston and Donatas Januta, Deputy Attorneys General, for Defendants and Respondents.

Arata, Misuraca & Clement, Misuraca & Beyers, Malcolm A. Misuraca and James L. Beyers for Real Parties in Interest and Respondents.

## OPINION

**ELKINGTON, J.**—This appeal concerns the validity of certain "devel-opment" permits issued by respondent California Coastal Zone Conservation Commission (hereafter "Commission") under authority of the California Coastal Zone Conservation Act of 1972 (hereafter sometimes the "Act") found in Public Resources Code sections 27000-27650, inclusive. The permits authorized construction of 15 homes on lots owned by the individual real parties in interest of this appeal, in a subdivision called "Sea Ranch" located on the northernmost coast of Sonoma County.

Hereafter statutory references, unless otherwise noted, will be to the appropriate sections of the Act as they appear in the Public Resources Code.

The Act was an initiative measure approved by the state's electors in 1972. Its purpose and policy were stated as follows:

"The people of the State of California hereby find and declare that the California coastal zone is a distinct and valuable natural resource belonging to all the people and existing as a delicately balanced ecosystem; that the permanent protection of the remaining natural and scenic resources of the coastal zone is a paramount concern to present and future residents of the state and nation; that in order to promote the public safety, health, and welfare, and to protect public and private property, wildlife, marine fisheries, and other ocean resources, and the natural environment, it is necessary to preserve the ecological balance of the coastal zone and prevent its further deterioration and destruction; that it is the policy of the state to preserve, protect, and, where possible, to restore the resources of the coastal zone for the enjoyment of the

current and succeeding generations; and that to protect the coastal zone it is necessary:

"(a) To study the coastal zone to determine the ecological planning principles and assumptions needed to ensure conservation of coastal zone resources.

"(b) To prepare, based upon such study and in full consultation with all affected governmental agencies, private interests, and the general public, a comprehensive, coordinated, enforceable plan for the orderly, long-range conservation and management of the natural resources of the coastal zone, to be known as the California Coastal Zone Conservation Plan.

"(c) *To ensure that any development which occurs in the permit area during the study and planning period will be consistent with the objectives of this division.*

"(d) To create the California Coastal Zone Conservation Commission, and six regional coastal zone conservation commissions, to implement the provisions of this division." (§ 27001; italics added.)

The Act created the Commission (§ 27200), and several regional commissions (§ 27201). The Commission was mandated (by § 27300) to "prepare, adopt, and submit to the Legislature for implementation the California Coastal Zone Conservation Plan" (hereafter the "Plan"). Submission of the Plan was required on or before December 1, 1975. (§ 27320.)

With reference to the Plan the Act provided:

"The coastal zone plan shall be consistent with all of the following objectives:

"(a) The maintenance, restoration, and enhancement of the overall quality of the coastal zone environment, including, but not limited to, its amenities and aesthetic values.

"(b) The continued existence of optimum populations of all species of living organisms.

"(c) The orderly, balanced utilization and preservation, consistent with sound conservation principles, of all living and nonliving coastal zone resources.

"(d) Avoidance of irreversible and irretrievable commitments of coastal zone resources." (§ 27302.)

Apparently in recognition of the probability that it would be unreasonable or unjust, and possibly unlawful or unconstitutional, to prevent all development within the state's coastal zone until the Plan's adoption by the Legislature, the Act authorized interim permit control by the Commission. It stated:

"On or after February 1, 1973, any person wishing to perform any development within the permit area shall obtain a permit authorizing such development from the regional commission and, if required by law, from any city, county, state, regional or local agency." (§ 27400.)

Additionally, the Act provided:

"No permit shall be issued unless the regional commission has first found, both of the following:

"(a) *That the development will not have any substantial adverse environmental or ecological effect.*

"(b) *That the development is consistent with the findings and declarations set forth in Section 27001 and with the objectives set forth in Section 27302.*

"The applicant shall have the burden of proof on all issues." (§ 27402; italics added.)

"The application of these factors [of § 27402] requires the Commission to undertake a delicate balancing of the effect of each proposed development [i.e., the subject of the requested permit] upon the environment of the coast as a predicate to the issuance of a permit." (*State of California* v. *Superior Court (Veta Co.)*, 12 Cal.3d 237, 248 [115 Cal.Rptr. 497, 524 P.2d 1281].)

And the Act required that:

"All permits shall be subject to reasonable terms and conditions in order to ensure:

"(a) Access to publicly owned or used beaches, recreation areas, and natural reserves is increased to the maximum extent possible by appropriate dedication.

"(b) Adequate and properly located public recreation areas and wildlife preserves are reserved.

"(c) Provisions are made for solid and liquid waste treatment, disposition, and management which will minimize adverse effects upon coastal zone resources.

"(d) Alterations to existing land forms and vegetation, and construction of structures shall cause minimum adverse effect to scenic resources and minimum danger of floods, landslides, erosion, siltation, or failure in the event of earthquake." (§ 27403.)

The 15 lot owners seeking to build homes had obtained permission to build by the appropriate authorities of Sonoma County. Following the Act's enactment they applied to the proper regional commission (hereafter "Regional Commission") for permits under section 27400. The permits were granted.

Deeming themselves aggrieved by the Regional Commission's action, the appellants here, Natural Resources Defense Council, Inc. and California Coastal Alliance, Inc., appealed to the Commission under the following procedure of the Act:

"(a) An applicant, or any person aggrieved by approval of a permit by the regional commission, may appeal to the commission.

"(b) The Commission may affirm, reverse, or modify the decision of the regional commission. If the commission fails to act within 60 days after notice of appeal has been filed, the regional commission's decision shall become final.

"(c) The commission may decline to hear appeals that it determines raise no substantial issues. Appeals it hears shall be scheduled for a de novo public hearing and shall be decided in the same manner and by the same vote as provided for decisions by the regional commissions." (§ 27423.)

Following a public hearing and the adoption of a written report and "Findings and Declarations," the Commission ordered that the requested permits be granted.

Appellants thereupon sought "judicial review of such decision or action by filing a petition for a writ of mandate" in the superior court, as permitted by section 27424, and in accordance with the procedure of Code of Civil Procedure section 1094.5. The superior court denied the petition for mandate and the instant appeal followed.

■ The respondents Commission and Regional Commission raise a threshold question which should first be considered by us. They state the question as "whether Commission action on a permit application is (1) *quasi-legislative,* in which event the Commission decision must be upheld unless determined to be arbitrary, capricious, or totally lacking in evidentiary support, or (2) *quasi-judicial,* in which event the Commission decision must be upheld unless the Commission determination is not supported by substantial evidence in light of the whole record." They contend that the subject proceedings were quasi-legislative in nature. Appellants on the other hand insist that they were quasi-judicial.

The distinction between the quasi-legislative and the quasi-judicial is sometimes difficult to determine. Respondents, correctly summarizing the authority they have offered for their contention, concede that "whether a particular action of an administrative agency is quasi-legislative or quasi-judicial depends upon whether the enabling statute delegated a function which is 'essentially legislative' or 'essentially judicial.'" The Commission was obliged to hold a public de novo hearing, to consider the evidence adduced and then, in its discretion, to allow or disallow the requested permits. Further, it was required to make written findings supportive of its determination.[1] We opine that, beyond any doubt, the subject proceedings were quasi-judicial and we so hold.

[1]See section 27423, subdivision (c), quoted in full *ante,* to the effect that appeals to the Commission call "for a de novo public hearing and shall be decided in the same manner ... as provided for decisions by the regional commissions" in sections 27402 and 27403.

On this appeal our task is similar to that of the superior court. It extends "to the questions whether the [Commission] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [Commission] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b); and see *State of California* v. *Superior Court (Veta Co.), supra,* 12 Cal.3d 237, 245, 251.)

We proceed to a consideration of the issues at hand.

The Sea Ranch is a phased subdivision development zoned for a potential of 5,200 single-family residential building lots. Authorized phasing, now in effect, permits subdivision and sale of 1,762 such homesites. Of the 1,550 building lots which have been sold, 340 have homes upon them; the rest are unimproved. The building lots of the subject permits were subdivided prior to approval of the Act by the state's voters in 1972, and implementation of the permits would add 15 new homes. The northerly boundary of the area is at the mouth of a small coastal stream, the Gualala River, and it extends from that point about 10 miles south along the Pacific Ocean's shoreline. It fronts upon about 1 percent of California's ocean beaches, and contrary to the public policy of the state (see *Gion* v. *City of Santa Cruz,* 2 Cal.3d 29 [84 Cal.Rptr. 162, 465 P.2d 50]), the purpose, or at least the original purpose, was that its 10-mile stretch of beaches be available only to Sea Ranch's lot owners. Upon full "buildout" of the property it would be the largest community on the Pacific Ocean between San Francisco and Eureka.

No integrated sewage system was planned for the subdivision; in its place septic tanks were to be used. The water supply was from a well on the banks of the Gualala River. The subdivision straddled state Highway 1, but the greater number of its lots were to the seaward. The highway, which roughly paralleled the ocean shore, was the only means of reaching the property. It was a narrow, winding, "rural" road with but one lane in each direction. Alongside it were planted trees which tended to obscure a traveler's ocean view as he passed through the subdivision.

Evidence adduced at the Commission's hearing indicated that reliance upon septic tanks in subdivisions of the size and density of Sea Ranch was "to invite trouble." Even under the best of conditions they were said

to sometimes fail, contaminating streams and ground water, and generally constituting a health hazard and a threat to the environment.

Other evidence was to the effect that man-induced rainwater and septic tank runoff on the subdivision constituted a serious erosion threat; that "even with the relatively few . . . structures now in place, there are indications of severe erosion and cliff retreat"; and that at full buildout the situation could be expected to be much worse. It was said that: "Gullying due to development has been observed. Strict controls over the removal of vegetation, grading, and man-caused disruption or augmentation of surface and subsurface water movement is required."

The probable congestion of traffic on Highway 1 was the subject of the following expert testimony. Already the road "peaked" at 280 vehicles per hour on summer weekends. A report stated: "Highway 1, in its more curving sections, can never offer more than 'fair' service. Sight distances down the road is so impaired that cars cluster into little platoons behind slow-moving vehicles waiting for a chance to pass. When traffic flows approach a two-way flow of around 400 vehicles per hour the chances of finding a safe passing situation are lost and drivers become 'trapped'. The slowest vehicle now determines the rate of progress for all, and the quality of service is rated 'poor'. As traffic volumes further increase, the driving experience becomes even more degraded until the point of bumper-to-bumper, start and stop congestion is reached." Sea Ranch, at full buildout, could be expected to increase the peak periods to substantially more than 400 vehicles per hour. The Commission had considered the cost and effect of improving the highway; it found: "Major highway construction in the area would be enormously expensive both in dollar and environmental terms: based on recent costs of highway projects in the area, improving Highway 1 between Jenner and Gualala to State standards for a 2-lane roadway with normal-width shoulders could cost perhaps $40 million, and the cost would rise with increasing inflation. Even lesser improvements such as curve realignments cost hundreds of thousands of dollars for each improvement. (Cost figures for alternative road improvements have been compiled by the Commission's staff and are in the appeal file.) And substantial improvements to the highway could require large cuts and fills along this scenic route, and could change the coastal experience from one of driving on an essentially rural road to one of driving on a much more urban roadway."

Other evidence indicated that little had been done by the subdivider to allow public access through the property to the beaches, and that diversion of water to the subdivision from the well near the Gualala River could unduly jeopardize fish life in, and the flow of, the river.

In granting the 15 permits the Commission, according to section 27403, imposed certain conditions which are described by appellants in this manner: "In addition to a program to 'monitor' the cumulative effects of septic tanks, as described above, these 'overall conditions' included a program to thin and trim trees planted by the developer west of Highway 1 which presently interfere with ocean views; a system of public access along The Sea Ranch coastline, to be provided through the issuance of a limited number of permits per day; and a program to monitor the effects of The Sea Ranch water diversions on the water flow and fish life in the Gualala River."

On their appeal to this court appellants have condensed several of their contentions as follows:

"The California Coastal Zone Conservation Act, Public Resources Code §§ 27000 et seq. ('the Coastal Act') requires that the Commission deny all development which would 'have any substantial adverse environmental or ecological effect.' Section 27402. The Act also places special emphasis on the provision of proper sewage treatment and disposal and the prevention of erosion. It requires the Commission to impose conditions on all development which will 'minimize' these problems. Section 27403. [¶] The State Commission's decision does not evidence any attempt to meet these strict criteria. Rather, [1] the Commission refused to adhere to procedures designed to elicit full disclosure and consideration of the environmental consequences of its decision and [2] the reasons for that decision. It ignored its responsibility to prepare written findings in support of its decision in the manner required by law, and [3] it refused to prepare and consider an environmental impact report on further development at the Sea Ranch, as required by the California Environmental Quality Act, Public Resources Code §§ 21000 et seq." (4) Another contention is that the conditions imposed upon the granting of the permits were inadequate and otherwise invalid.

■ We first consider the claimed failure of the Commission "to adhere to procedures designed to elicit full disclosure and consideration of the environmental consequences of its decision."

Consideration of the instant contention makes it clear that appellants' principal grievance is not the 15 permits at issue, which would but increase the number of Sea Ranch's homes from 340 to 355. Instead they appear to view these permits as a sort of "foot in the door" which will lead to an ever growing number of permits and eventual environmental disaster at the subdivision. Complaining of the "magnitude of *projected development* at The Sea Ranch and its *potential impact* upon the coastal zone" (italics added), their argument, as we view it, is that the Commission should have adhered to "procedures designed to elicit full disclosure and consideration of the environmental consequences" of the subdivision's *final buildout.* Or, stated another way, the contention is that the 15 permits should not have been granted unless and until the Commission had found, on substantial evidence, that the *subdivision* itself, would "not have any substantial adverse environmental or ecological effect" and was otherwise "consistent with the findings and declarations . . . and with the objectives" of the Act. (See § 27402.)

A brief recapitulation of the purpose and function of the Commission seems appropriate at this point. It is required to make a broad study of the environmental and ecological problems and needs of California's rapidly developing coastal zone. It is directed to prepare and submit to the Legislature a "comprehensive, coordinated, enforceable plan [the Plan] for the orderly, long-range conservation and management of the natural resources" of that area. *In the interim,* authority is vested in the Commission to grant permits for "development" within the coastal zone under the criteria of sections 27402 and 27403, and the Act generally.

Patently, it is not required that the interim permits shall conform to the Plan before they may be issued. For the Act expressly contemplates that there be no Plan extant when such permit applications are considered, and granted or refused. Instead there is vested in the Commission a discretionary duty to use its best judgment, based upon evidence including its own recorded studies and according to the guidelines of the Act, whether granting of the *permit at issue* poses an unreasonable and unacceptable environmental threat. In its decisional process it will reasonably be aided by the expertise and knowledge it has

developed in its current preparation of the Plan. As said in *State of California* v. *Superior Court (Veta Co.), supra,* 12 Cal.3d 237, 248, the Act "requires the Commission [on such permit applications] to undertake a delicate balancing of the effect of each proposed development upon the environment of the coast . . . ." This "delicate balancing" concept implicitly confers a substantial discretion in the Commission in its factual determinations.

It may well be that appellants' apprehensions concerning the "projected development" and "potential impact" of 5,200 (or 4,000)[2] homes at Sea Ranch, under the circumstances brought out at the Commission's hearing, are justified. But our inquiry, on this appeal, extends no further than the determination whether the Commission could reasonably find that construction of the *15 permitted homes* would "not have any substantial adverse environmental or ecological effect," and was "consistent with the findings and declarations set forth in Section 27001 and with the objectives set forth in Section 27302." (See § 27402, quoted *ante.*)

The record of the Commission's proceedings is voluminous; it covers several thousand pages. Although the evidence was frequently in conflict, much of it indicated that Sea Ranch's final buildout (5,200 or 4,000 homes, vis-à-vis the present 340) would result in serious environmental consequences. But on the other hand there was evidence, and there were reasonable inferences derivable from that evidence, that the adverse environmental impact of the development contemplated by the 15 permits at issue would be minimal. We observe no abuse of discretion, or other error, in the Commission's conclusion that the requested permits would "not have any *substantial* adverse environmental or ecological effect" (italics added), and were otherwise consistent with the Act's requirements. (See § 27402.) Nor do we find merit in appellants' contention that "the Commission refused to adhere to procedures designed to elicit full disclosure and consideration of the environmental consequences of its decision."

Next we consider the contention that the Commission gave no reason for its decision and "ignored its responsibility to prepare written findings in support of its decision in the manner required by law."

---

[2]Some evidence indicated that the subdivider had decided to change the number of homesites to be sold from 5,200 to 4,000.

Here again the argument seems to be that the Commission, in granting the 15 permits,[3] was obliged to find that the Sea Ranch at total, or near total, buildout would "not have any substantial adverse environmental or ecological effect."

In support of its findings the Commission had taken evidence the written report of which, as indicated, comprises several thousand pages. The Commission's findings were also lengthy, and no purpose would be served by fully stating them here. They may be fairly summarized as finding that at buildout the subdivision would in several respects, possibly, or probably, pose a serious environmental threat. An illustration is found in a finding relating to water supply: "The projects now before the Commission would not have a significant effect on water demand, but significant buildout could. If , . . water is being diverted from the river, it may be necessary for the Sea Ranch to utilize reservoir storage facilities to protect fish life . . . ." Another: "[There is no evidence] sufficient for the Commission to make an unqualified finding that septic tanks will operate effectively upon continuing buildout at Sea Ranch, . . ."

The Commission then made its finding of ultimate fact, as required by section 27402, that ". . . as conditioned [see § 27403] the [15 permits] would not have any substantial adverse environmental or ecological effect and would be consistent with the findings, declarations, and objectives of the California Coastal Zone Conservation Act of 1972."

The applicable rule was recently stated in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12]: "[I]mplicit in [Code Civ. Proc.] section 1094.5 is a requirement that the agency which renders the challenged decision must set forth *findings to bridge the analytic gap between the raw evidence and ultimate decision or order.* If the Legislature had desired otherwise, it could have declared as a possible basis for issuing mandamus the absence of substantial evidence to support the administrative agency's action. By focusing, instead, upon the relationships between evidence and findings and between findings and ultimate action, the Legislature sought to direct the reviewing court's attention to the analytic route the

---

[3]The 15 permit applications were successively considered in groups of 11 and 4. The Commission's findings were made prior to the granting of the first group, and thereafter they were expressly made applicable in the granting of the second. No resulting prejudicial irregularity is claimed by any of the parties.

administrative agency traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route. Reference, in section 1094.5, to the reviewing court's duty to compare the evidence and ultimate decision to '*the findings*' (italics added) we believe leaves no room for the conclusion that the Legislature would have been content to have a reviewing court speculate as to the administrative agency's basis for decision." (Italics added.) ■ Under this rule the Commission is obliged to make a "written statement of the supportive facts on which [it] has made its decision," and such a report alone will satisfy the statutory written findings requirement. (*Friends of Mammoth* v. *Board of Supervisors*, 8 Cal.3d 247, 270 [104 Cal.Rptr. 761, 502 P.2d 1049].) The purpose of findings is to record the grounds upon which a judgment or other decision rests, thus to render its legality reasonably, and conveniently, reviewable on appeal. (*McKinnon* v. *McKinnon*, 181 Cal.App.2d 97, 101 [5 Cal.Rptr. 43]; *Taliaferro* v. *Taliaferro*, 178 Cal.App.2d 146, 147 [2 Cal.Rptr. 719].)

Here the Commission's total findings, clearly based upon substantial evidence, may reasonably be condensed to a determination that although the facts indicate that serious environmental hazards might or would attend uncontrolled and final buildout of Sea Ranch, the granting of the 15 permits at issue posed no such threat. The reasoning process of "the analytic gap between the raw evidence and ultimate decision" is made clear to this reviewing court, and otherwise the findings are in accordance with the Act, and established law. They were properly determined by the superior court to be legally adequate.

■ Nor do we find the 15 permits invalid for the claimed failure of the Commission "to prepare and consider an environmental impact report," as required by the California Environmental Quality Act, found in Public Resources Code section 21000 et seq.

We first observe that the exhaustive staff report of the Commission together with that agency's findings of fact, although not so entitled, was in substance an environmental impact report prepared and considered by the Commission before the granting of the subject permits. It was such an "informational document" as is required by Public Resources Code section 21061, with a content substantially such as that prescribed

by section 21100 of that code.[4] It is the substance, rather than the form, of such a document which determines its nature and validity. (See Civ. Code, § 3528; *Kennard* v. *Rosenberg,* 127 Cal.App.2d 340, 345 [273 P.2d 839].)

Secondly, on the immediate issue before us, we note that the California Environmental Quality Act requires an impact report on a project *"which may have a significant effect on the environment."* (Pub. Resources Code, § 21100; italics added.) On the other hand the Act (§ 27402) allows no permit until the Commission has found, on substantial evidence, that *"the development will not have any substantial adverse environmental or ecological effect"* (italics added). Here, as pointed out, the Commission did so find. Such a finding, in the context of the case before us, obviously renders the environmental impact report provisions of the Environmental Quality act inapplicable.[5] [6]

---

[4]Public Resources Code section 21061:
". . . [¶] An environmental impact report is an informational document which, when its preparation is required by this division, shall be considered by every public agency prior to its approval or disapproval of a project. The purpose of an environmental impact report is to provide public agencies with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which any adverse effects of such a project might be minimized; and to suggest alternatives to such a project."
Public Resources Code section 21100:
"All state agencies, boards, and commissions shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they propose to carry out or approve which may have a significant effect on the environment. Such a report shall include a detailed statement setting forth the following:
"(a) The environmental impact of the proposed action.
"(b) Any adverse environmental effects which cannot be avoided .if the proposal is implemented.
"(c) Mitigation measures proposed to minimize the impact including, but not limited to, measures to reduce wasteful, inefficient, and unnecessary consumption of energy.
"(d) Alternatives to the proposed action.
"(e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.
"(f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented.
"(g) The growth-inducing impact of the proposed action."

[5]We do not consider the effect of Public Resources Code section 21080.5 (added by Stats. 1975, ch. 1187, § 1, p. 2931), which is inapplicable to the instant proceedings.

[6]Although not necessary to our conclusion on the instant point, we note that federal courts have rather consistently held, as said in *Duquesne Light Co.* v. *Environmental Protection Agcy.,* 481 F.2d 1, 9, that "to require an agency charged with protecting the environment with the obligation to file a statement explaining the environmental impact of its decisions would be redundant." (Fn. omitted.) (And see *International Harvester*

■ The contention that the "inadequate" conditions attached to the permits rendered them invalid is also found to be without merit.

As indicated, these conditions tightened the requirements for installation and placement of septic tanks, and provided for their monitoring after installation. They provided for beach access by the public, for tree trimming and thinning out alongside Highway 1 and for the monitoring of water diversion from the Gualala River. And contrary to appellants' contention the conditions appear to be enforceable. (See §§ 27500, 27501; Cal. Admin. Code, tit. 14, §§ 13620, 13621.) They are found to be reasonable, to be supported by substantial evidence, and otherwise to be proper and responsive to the Commission's statutory duty under section 27403.

■ Appellants make an incidental complaint that they were denied reasonable access to the Commission's records. It also is found to be invalid. The subject records were "fragmentary" and tentative "staff reports" which were subject to staff discussion and "modification as more information is received." Their purpose was often the identification of issues in the analysis of the permit applications. They merely represented one person's thoughts and were "written for purposes of eliciting comments." They were in no sense final reports or recommendations. And it is noted that appellants "were told that they could read the reports for purposes of facilitating access to file data but not for purposes of quoting as public staff documents." No unreasonable denial of access to the Commission's records is made out.

Some or all of the real parties in interest here have taken proceedings in the federal district court to have the conditions of their permits set aside as unconstitutional; no similar contention is made by them here. They have however moved to abate and stay further proceedings on this appeal. We discern no merit in the motions and they will be denied.

The resolution of other, and incidental, points raised by the parties has become unnecessary to our disposition of the appeal.

From all of the foregoing we conclude that the proceedings of the Commission here at issue were conducted in accordance with law, and

*Company* v. *Ruckelshaus,* 478 F.2d 615, 650, fn. 130; *Anaconda Company* v. *Ruckelshaus,* 482 F.2d 1301, 1305-1306.)

otherwise without error or abuse of discretion under the standards of Code of Civil Procedure section 1094.5, subdivision (b).

The judgment is affirmed. The motions of the real parties in interest, or certain of them, to abate, and stay proceedings on, this appeal are denied.

Weinberger, J.,* concurred.

**SIMS, Acting P. J.,** Concurring.—I concur in the foregoing decision. I fully agree that where the agency is charged with refraining from issuing a permit until it has found that the development will not have any substantial adverse environmental or ecological effect (Pub. Resources Code, § 27402, subd. (a)), that it is not necessary to secure an environmental impact report under the provisions of C.E.Q.A. The record of the commission of course must sustain a finding that the development will not have such an effect.

The fundamental question here is whether the commission has properly disregarded the consequences which will result from the total population to be sustained if the subdivision of which applicants' lots are a part is fully built out. It seems to me that at some point a beginning must be made to avoid what appears to be the inevitable conflict between the results of that build out and the environmental purposes and objectives set forth in the California Coastal Zone Conservation Act of 1972. It would appear preferable to make that beginning at this time. I reluctantly acknowledge that the interim nature of the permit power prevents a permanent solution with these applications. In doing so I consider that any applicant, despite his reluctance to appear in these proceedings, if and when he elects to exercise the right to develop granted by the commission will be bound by the conditions imposed as set forth in the records of the regional and state commissions. Nor shall the granting of these permits limit in any way the power of any successor commission or regulatory body to impose appropriate restrictions in connection with further development.

A petition for a rehearing was denied May 4, 1976, and appellants' petition for a hearing by the Supreme Court was denied June 2, 1976.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.