The SEA RANCH ASSOCIATION, a California nonprofit corporation, et al., Plaintiffs,

v.

The CALIFORNIA COASTAL COMMISSION, et al., Defendants.

No. C–74–1320.

United States District Court,
N. D. California.

April 7, 1981.

Judgment Vacated Nov. 18, 1981. See 102 S.Ct. 622.

Pillsbury, Madison & Sutro, Robert M. Westberg, Reginald D. Steer, San Francisco, Cal., for plaintiffs.

George Deukmejian, Atty. Gen. of the State of Cal., R. H. Connett, N. Gregory Taylor, Asst. Attys. Gen., Roderick Walston, Daniel J. Taaffe, Patricia Sheehan Peterson, Deputy Attys. Gen., San Francisco, Cal., for defendants.

Helene Linker, Roger Beers, San Francisco, Cal., for Natural Resources Defense Council, Inc. and Sierra Club.

Before DUNIWAY, Circuit Judge, and EAST and WILLIAMS, District Judges.

## OPINION

SPENCER WILLIAMS, District Judge.

The parties have been here before. In the prior proceeding, *Sea Ranch Association v. California Coastal Commission*, 396 F.Supp. 533, aff'd, 537 F.2d 1058 (9th Cir. 1976), plaintiffs challenged the constitutionality of both the permit system and vested rights exemption system under the 1972 California Coastal Zone Conservation Act.[1] This court, although aware of the hardships which could result, chose to abstain and noted: (1) federal judicial action would interfere with the state regulatory scheme; (2) tentative or premature decisions on issues of state law should be avoided when a state court decision might eliminate or minimize the federal constitutional issue(s); and (3) plaintiffs here as well as others were pressing several very similar cases in

the state court. The Circuit Court affirmed the abstention "[t]o the extent that the federal complaint alleged a vested rights exemption for the entire Sea Ranch project," but held the complaint should have been dismissed for lack of case or controversy "[t]o the extent [it] alleged vested rights exemptions for individual property owners at the Sea Ranch." *Id.* at 1064.

Subsequent to the Circuit's decision, the California Court of Appeal, in *Oceanic California, Inc. v. The North Central Coast Regional Commission, et al.*, 63 Cal.App.3d 57, 133 Cal.Rptr. 664 (1976), *cert. denied and appeal dismissed*, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977), held the developer of Sea Ranch did not have a vested rights exemption to complete the development, without obtaining required permits from the regional coastal commission. This interpretation by the California Court of Appeal foreclosed the claims raised in plaintiffs' federal complaint.

Plaintiffs have now filed an amended complaint which alleges that, as applied to them, the California Coastal Act of 1976 is unconstitutional in that it takes their property for public use without just compensation and denies them due process and equal protection. They seek declaratory and injunctive relief.

Since the parties were last before this court the Coastal Commission has taken final action on 32 permits. These applications have been approved subject to the fulfillment of certain overall conditions developed by the commission with a view toward full build-out at Sea Ranch. These conditions generally relate to (1) water supply, (2) septic tank systems, (3) internal roadways, (4) site and design limitations, (5) public access, and (6) view easements.[2]

---

1. At the time of this court's previous decision, the Coastal Zone Conservation Act of 1972, former California Public Resources Code §§ 27000 *et seq.*, was in effect. The 1972 Act has been superseded by the California Coastal Act of 1976 (California Public Resources Code §§ 30000 *et seq.*). The basic thrust of the environmentally protective policies of the 1972

Act remain unchanged in the 1976 statute. Hereinafter all references to code sections refer to the California Public Resources Code and the 1976 California Coastal Act.

2. The conditions are set forth in the Sea Ranch Overall Conditions and Findings before this court as the Commissioner's Exhibit C. The

Plaintiffs have moved for partial summary judgment that two of the "final" conditions adopted by the commission—the required public access and view easements—are unconstitutional. Specifically, they urge the conditions constitute a taking of their property without just compensation because (1) no individual lot owner is able to comply with the requirements and (2) the conditions have been imposed without regard to the relationship, or lack thereof, between a particular application and the condition imposed. This court rejects both arguments and finds the challenged conditions valid for the reasons stated below. The defendants moved this court to dismiss or in the alternative to abstain. Matters outside the pleadings having been presented to the court, the motion to dismiss is treated as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(b). The court grants summary judgment in favor of defendants.

■ The United States Supreme Court has held that property may be regulated to a certain extent, but if that regulation goes too far it will be recognized as a taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Land use regulations, however, have been upheld as a proper exercise of the police power if they are reasonable and a presumption of reasonableness lies with the state or agency action. *Goldblatt v. Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). The

reasonableness of each regulation must be evaluated on the specific facts of each case. *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979).[3]

Much of the factual history of this dispute appears in our previous opinion. However, since our inquiry focuses on the reasonableness of the governmental action as it relates to the plaintiffs, this court reviews the goals as well as the authority of the Coastal Commission under the California Coastal Zone Conservation Act before examining the challenged conditions and the methods by which the Commission has chosen to impose them.

Among the duties of the California Coastal Commission is the protection and maintenance of the public's access to and enjoyment of the California coastline.[4] One of the basic goals for the coastal zone is to "maximize public access to and along the coast consistent with . . . constitutionally protected rights of private property owners."[5] Maximum access is to be provided and development is not to interfere with the public's right to access to the sea.[6] Additionally, public access to the sea from the nearest public roadway to the shoreline is to be preserved and provided in new development projects.[7]

The Act follows policies set out in the California Constitution[8] which provides that no person claiming or possessing frontage to navigable waters in this state may

court hereby takes judicial notice of these findings. The subdivision wide conditions address, (1) adequacy of the water supply for the Sea Ranch and the diversion of water from nearby rivers, (2) provision for a system for monitoring septic tank installation and use, (3) provision for internal roadways in the development to avoid highway congestion on Highway 1, (4) site and design limitations, (5) the problem of establishing adequate public access to the public tidelands along the ten mile stretch of ocean front adjacent to Sea Ranch, and (6) the problem of preserving coastal views which are threatened by trees planted by Oceanic and the association and maintained by the association.

3. *See, Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1980); *Dahl v. City of Palo Alto*, 372 F.Supp. 647 (N.D.Cal. 1974).

4. California Public Resources Code, § 30001.-5(c). All subsequent Section references are to the California Public Resources Code. One of the goals of the Commission is to "protect . . . enhance and restore the overall quality of the coastal zone environment." § 30001.5(a). The coastal zone has been declared "a distinct and valuable resource of vital and enduring importance to all the people and exists as a delicately balanced ecosystem." (§ 30001.)

5. § 30001.5(c).

6. § 30210.

7. § 30212.

8. California Const. art. X, § 4.

exclude the public's right of way to such waters when required for any public purpose.[9] Equally relevant to this action are portions of the California Coastal Zone Conservation Act which provide that the scenic and visual quality of the coastline is to be considered and protected as a resource of public importance.[10] Permitted development is to be sited and designed to protect views along the coastline.[11]

The Coastal Commission has been given the power to implement these goals through its permitting power.[12] All development in the coastal zone is subject to review by the Commission which may impose "reasonable terms and conditions" to insure compliance with the policies of the Act.[13]

■ With these provisions of the Act in mind, this court finds public access and aesthetic considerations constitute areas that legitimately fall within the Commission's regulatory power.[14] The permitting process is the means for the Commission to enforce the power delegated to it. It is clear that the Commission would be in violation of the policies and its duties as spelled out under the Act if it had not formulated or imposed the challenged conditions. Absent imposition of these or similar conditions ten miles of the California coastline would become a private beach with many portions of it cut off from the public's view.

Conditions similar to the ones in the instant case have been upheld by the courts. In *Associated Home Builders v. City of Walnut Creek*, 4 Cal.3d 633, 94 Cal.Rptr. 630, 484 P.2d 606 (1971), the California Supreme Court sustained the constitutionality of a statute authorizing cities and counties to require dedication of land or payment of fees as a condition to approval of a subdivision map. An association of developers and builders challenged the statute and the city ordinance and resolutions enacted thereunder on the grounds that the regulations violated equal protection and due process in that they deprived them of their property without just compensation. The association, like the plaintiffs in this case, argued the state was attempting to avoid the obligation of compensation for public facilities which would be enjoyed by all citizens of the city and only incidentally by subdivision residents. The association contended the future residents of subdivisions would be forced to bear the burden imposed on the subdividers and they would be required to pay for recreational facilities the need for which stemmed not from the development of any one subdivision but from the needs of the community as a whole. In an argument similar to the one advanced by plaintiffs, the association asserted the requirement could only be justified if it was shown that the need for a particular park was directly attributable to the increase in population caused by a particular subdivision.[15]

The California Supreme Court rejected this contention and held the dedication requirement could be upheld without a showing a subdivision directly created a need for it. The court found that in determining whether or not a condition imposed was a reasonable exercise of the police power rather than a taking, the court was not limited to consideration of the actual immediate impact of a particular subdivider or permittee. The court also looked at the "general public need for recreational facilities caused by present and future subdivi-

9. § 30252.

10. § 30251.

11. *Id.*, Highway 1 is to remain a scenic two-lane highway. § 30254.

12. § 30600.

13. § 30607.

14. The particular conditions challenged here have already been found to be reasonable, to be supported by substantial evidence, and otherwise proper and responsive to the Commission's statutory duty under the Act. *Natural Resources Defense Council, Inc. v. California Coastal Zone Conservation Com.*, 57 Cal. App.3d 76, 129 Cal.Rptr. 57 (1976).

15. *Associated Home Builders v. City of Walnut Creek*, 4 Cal.3d 633, 637–38, 94 Cal.Rptr. 630, 634, 484 P.2d 606, 610 (1971).

sions."[16] It reviewed reports indicating statewide concern over open space and public facilities and recent amendments to the state Constitution aimed at providing open space to the public. All of these factors led the court to conclude open space and public facilities for recreation were as important to the public health and welfare as sewers or streets.[17] Additionally, future as well as immediate needs could be taken into consideration in evaluating the dedication requirements. The court was not restricted in its appraisal of the statute to the impact of a particular subdivider nor was it limited to the set of facts as it existed at a particular point in time. The court could consider the overall impact of a particular development and others like it, the needs of the public, now and in the future, even the growing enlightenment about the public's need for aesthetically healthful surroundings and open space.

The association also contended that even if a showing of a direct relationship between a particular subdivision and an increase in the community's recreational needs was not required, subdividers could not be compelled to dedicate land for such needs unless their contribution would primarily benefit their particular subdivision. The court found the conditions were not improper even though they might benefit the city as a whole as much or more than the developers and future residents.

The court's reasoning in upholding the dedication requirements was based in part on the case of *Ayres v. City Council of Los Angeles*, 34 Cal.2d 31, 207 P.2d 1 (1949). In *Ayres* the City of Los Angeles imposed on the developer certain conditions for the development of a residential tract. The challenged conditions included a requirement that he dedicate a strip of land abutting a major thoroughfare bordering one side of the subdivision, but from which there was no access into the subdivision. The subdivider argued that he could be compelled to dedicate land only for streets within the subdivision to ease the flow of traffic there-

in and that no dedication could be required for additions to existing streets. He asserted that the dedication would be invalid as a taking because the benefit to the lot owners in the tract would be relatively small compared to the benefit to the city at large. The *Ayres* court disagreed for the same reasons outlined above; a subdivider seeking to acquire the advantages of subdivision has a duty to comply with reasonable conditions for dedication so as to conform to the welfare of the lot owners and the general public. The challenged conditions were not improper because their fulfillment benefits the public as a whole, because future as well as immediate needs are taken into consideration, or because potential as well as present population factors affecting a site are considered in the formulation of conditions imposed on the subdivider or permittee.

The *Ayres* court also upheld a condition requiring the developer to preserve a strip of land for the planting of trees and shrubbery. Other courts have approved regulations requiring the planting of trees and shrubbery, and the preservation of views and open space as valid exercises of the police power. In *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) the United States Supreme Court sustained a land use project against the owner's claims of an unconstitutional taking. The Court upheld the imposition of conditions to promote aesthetic or scenic considerations as within the regulatory power of state and local agencies. The Court stated:

> The concept of the public welfare is broad and inclusive.... The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. 348 U.S. at 33, 75 S.Ct. at 102.

---

16. *Id.* at 634, 94 Cal.Rptr. at 634, 484 P.2d at 610.

17. *Id.* at 641, 94 Cal.Rptr. at 636, 484 P.2d at 612.

This court, in a prior case, has rejected constitutional challenges to a zoning ordinance aimed at preserving the aesthetics of a community through placement of underground utilities and plantings. The court upheld such an ordinance in *Confederacion de la Raza Unida v. City of Morgan Hill*, 324 F.Supp. 895 (N.D.Cal.1971) and went on to note the "by now well-recognized right of the local authorities in zoning matters, ... to take esthetic considerations into account." *Id.* at 898.

These cases indicate planning bodies may condition development on aesthetic considerations or dedications of property for public recreational facilities or access.[18] The fact that the development has no direct nexus to the condition, that the benefit to the public is greater than to the developer, or that future needs are taken into consideration, does not destroy the validity of the condition. The court is free to look to these factors, as well as the general goals behind the authorizing statute, in evaluating the reasonableness of the regulation.

Applying these standards to the instant case it is clear that the challenged conditions must stand. The public need for access to state beaches on foot or visually and the importance the people of California place on that need have been embodied in the California Coastal Zone Conservation Act. The Act spelled out the need to maximize public access and views. As we noted earlier, failure to implement these conditions would result in loss of public access and views on a substantial portion of the northern California coastline. Moreover, the gradual build-out at Sea Ranch, and like developments in the region, with the likely attendant increase in local population and tourism, will increase the existing need for public access.

The court finds the tree trimming and public access conditions are valid conditions within the ambit of the Commission's regulatory power.[19] This, however, does not lay this case to rest. The real crux of this dispute is not the conditions, but the method or manner through which the Commission seeks to have its policies and conditions enforced. Plaintiffs claim the conditions are invalid since it is impossible for any individual landowner to comply; he cannot acquiesce on his own, but must seek association compliance. Furthermore, the conditions are not to be carried out on land that is his to dedicate or control, but on association land.

We reject this argument as a basis for invalidating the Commission's regulations. Numerous courts have upheld regulations which impose conditions upon development of individual property although those conditions required action by third parties beyond the individual's exclusive control.[20] We do not examine them in detail since each regulation must be judged on the facts of each particular case.

18. The court in *Ayres* noted that the concept of what falls within the health and welfare of the public and the ambit of the police power is a changing one; "*In Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 at 387 [47 S.Ct. 114 at 118, 71 L.Ed. 303] (1926) it was observed that regulations, the wisdom, necessity and validity of which as applied to existing conditions were so apparent that they are now uniformly sustained, would probably have been rejected as arbitrary and oppressive a century or even a half a century ago; that while the meaning of constitutional guaranties is invariable, the scope of their application must expand or contract to meet the physical changes which are constantly coming within the field of their operation; and that only those regulations must fall which clearly do not meet the constitutional meaning as applied to changing conditions." *Ayres v. City Council of Los Angeles*, 34 Cal.2d 31, at 43, 207 P.2d 1 at 8 (1949).

19. *See* note 14, *supra*. We note these are continuing obligations. We do not consider the question of the California Coastal Commission's ability to enforce these continuing obligations once permits have been granted and homes have been built. The question of continuing enforcement is not before us and will present different issues from those now at bar.

20. *See, e.g., U.S. v. Douglas County, Nevada*, 5 E.R.C. 1577 (U.S.D.C.Nev.1973); *Morshead v. California Regional Water Quality Control Board*, 45 Cal.App.3d 442, 119 Cal.Rptr. 586 (1975); *Swanson v. Marin Mun. Water District*, 56 Cal.App.3d 512, 128 Cal.Rptr. 485 (1976); and *Hollister Park Inv. Co. v. Goleta County Water District*, 82 Cal.App.3d 290, 147 Cal. Rptr. 91 (1978).

Plaintiffs would invite this court to ignore the specific facts of this case; specifically that they are part of the Sea Ranch Development, the Sea Ranch Association, and that they knowingly purchased their land subject to the covenants of the Sea Ranch Association.[21] The plaintiffs want to be treated as individual lot owners. However, this court can only assume that they were all aware at the time of their individual purchases that they were buying more than an individual lot on the California coast. They were also buying into the development, specifically the association with all the attendant rights and responsibilities that go with association membership, i.e., voting rights,[22] association provision for police and garbage facilities,[23] design and site approvals from the association,[24] and association ownership and control of the common areas within the development.[25]

Plaintiffs would have this court ignore the particular style of ownership the plaintiffs have voluntarily entered into. Plaintiffs knew, or should have known, at the time they purchased their lots that certain of their actions would be subject to Association approval or action. They cannot voluntarily restrict their land to a single use and bind themselves to the Sea Ranch Association and its covenants only to later assert a taking when the Coastal Commission attempts to deal with them in part through that entity. We consider them as members of the Sea Ranch Association, which is an overall development of a substantial area of the northern California coast and a pseudo governmental entity capable of managing that body of land. The individual lot owners are not powerless to affect compliance with the overall conditions. The plaintiffs, as landowners, all have a vote in the association. Additionally, they like any other voter, have the right to lobby neighbors and association members. Significantly, it appears that the number of lot owners who have not yet built or received building permits substantially outnumbers the lot owners who have built. Thus, if the lot owners seeking permits, instead of fighting the Commission, co-operate to have the Association carry out the conditions imposed by the Commission, those conditions can in fact be carried out. To follow plaintiffs' course and ignore the Sea Ranch development and the Sea Ranch Association as a whole would invite landowners in the future to engage in complicated forms of ownership to avoid government regulations.

We find it is not impossible for the plaintiffs to comply with the conditions imposed upon them. Equally important, during the period of its stewardship, the Coastal Commission need not grant any building permit where development would be inconsistent with the objectives of the Act. Indeed, the Act contains something of a bias against further development during this interim period before local coastal programs have been prepared. Because of the temporary nature of its authority, a flat prohibition by the Commission on a coastal development project does not amount to a taking. *Kopetzke v. County of San Mateo*, 396 F.Supp. 1004, 1009 (N.D.Cal.1975); *State of California v. Superior Court*, 12 Cal.3d 237, 252–255, 115 Cal.Rptr. 497, 506–509, 524 P.2d 1281, 1290–1293 (1974). Certainly if the denial of a permit would be permissible, the grant of a permit on reasonable conditions must be permissible as well.

And if the conditional permits do not work a taking of the individual lot owner's property, it follows that neither do they

---

**21.** Pursuant to Rule 201, Federal Rules of Evidence, the court takes judicial notice of the declaration of restrictions, covenants and conditions known as "The Sea Ranch Restrictions," which were recorded in the Office of the Recorder, County of Sonoma, on May 10, 1965, in Book 2127 of Official Records at page 237, as amended by the Certificates of Amendment recorded on October 14, 1969, in Book 2422 of Official Records at page 567, and on September 16, 1971, in Book 2565 of Official Records at page 510.

**22.** Sea Ranch Restrictions 5.03.

**23.** Sea Ranch Restrictions 5.04(g).

**24.** Sea Ranch Restrictions 4.01–07.

**25.** Sea Ranch Restrictions 5.05(d), 9.05(a) and (4).

threaten a taking of the Association's property. Should the Association agree to the conditions, it will benefit a substantial portion of its membership. Should it refuse to do so—as it is free to do—it will be made a party to a temporary standstill in coastal development but not to a taking of any lot owner's property. We need not decide now whether the indefinite or permanent imposition of these conditions would work a taking of an individual lot owner's property or that of the Association. In short, neither the conditions nor the method the Coastal Commission has chosen to enforce them are impermissible. The conditions are a necessary and reasonable way for the Coastal Commission to deal with the problems of preserving public views and access to the coastline while allowing building and growth at the Sea Ranch, now and in the future.

The plaintiffs moved for partial summary judgment on only two of the six overall conditions imposed by the Coastal Commission. Defendant Coastal Commission urged that this court avoid piecemeal litigation and either abstain or consider the validity of all the conditions. In the interest of avoiding piecemeal litigation and, even more important, in the interest of ending any future uncertainty in this long, hardfought and difficult dispute, we also sustain the validity of the four remaining conditions. These conditions were listed at the beginning of this opinion. They are aimed at providing and maintaining adequate water supplies and water quality, monitoring sewage treatment, providing internal roadways to ease the impact of increased traffic on Highway 1, and site and design

limitations aimed at preventing erosion and protecting the scenic beauty of the area.

Plaintiffs' own memo in support of the motion for partial summary judgment recognized that these types of regulations fit more readily into the traditional definitions of an appropriate exercise of the police power.[26] Water supplies, water quality, and sewage treatment have long been recognized as vital to the public's health and welfare.[27] Regulation of these areas have been upheld by the courts as a valid exercise of the police power even though the harm to the individual is substantial and use of his land is severely limited.[28] Regulations calling for dedication of internal roadways in developments to ease traffic congestion have also been approved,[29] as have those dealing with siting and design limitations aimed at preserving open space or the scenic quality of an area.[30] Moreover, this court takes judicial notice of the decision of the California Court of Appeal in *Natural Resources, etc. v. California Coastal Zone, etc.,* 57 Cal.App.3d 76, 129 Cal.Rptr. 57 (1976). In that case, brought by the Natural Resources Defense Council, the Court of Appeal was asked to review the decision of the Coastal Zone Conservation Commission to issue building permits for 15 homes at the Sea Ranch. The court considered several issues, among them the validity of the conditions placed by the Commission on the issuance of the permits. The court considered the evidence adduced at the Commission's hearings that indicated the conditions were needed to meet the demands the build-out at Sea Ranch would make upon the area.[31] The court found the

---

26. Plaintiffs' Brief in support of the motion for partial summary judgment indicates a judgment on the access and tree conditions "may encourage the parties to resolve, in the context of this litigation, the remaining issues relative to the other four conditions." We recognize, however, that plaintiffs contemplated judgment in their favor.

27. *Miller v. Board of Public Works of City of Los Angeles,* 195 Cal. 477, 234 P. 381 (1925) (upholding ordinance requiring installations of water lines at developer expense); *Morshead v. California Regional Quality Board,* 45 Cal. App.3d 442, 119 Cal.Rptr. 586 (1975).

28. *See* cases cited in note 20, *supra.*

29. *Ayres v. City Council of Los Angeles,* 34 Cal.2d 31, 207 P.2d 1 (1949).

30. *Agins v. City of Tiburon,* 157 Cal.Rptr. 372, 598 P.2d 25 (1979) 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

31. The court noted that substantial buildout at Sea Ranch would have serious environmental effects:

"No integrated sewage system was planned for the subdivision; in its place septic tanks

conditions to be "reasonable, to be supported by substantial evidence, and otherwise to be proper and responsive to the Commission's statutory duty under section 27403." [32] This court agrees. Our ruling is based on the Court of Appeal findings and in part on our own review of the record before us.

Since we previously found the method of enforcing compliance with these conditions to be valid, and now find the remaining conditions valid, plaintiffs have no further basis for a claim before this court. Accordingly, summary judgment is hereby ordered in favor of the defendants and the case is dismissed. Each party to bear its own costs.

IT IS SO ORDERED.

were to be used. The water supply was from a well on the banks of the Gualala River. The subdivision straddled state Highway 1, but the greater number of its lots were to the seaward. The highway, which roughly paralleled the ocean shore, was the only means of reaching the property. It was a narrow, winding 'rural' road with but one lane in each direction. Alongside it were planted trees which tended to obscure a traveler's ocean view as he passed through the subdivision. Evidence adduced at the Commission's hearing indicated that reliance upon septic tanks in subdivisions of the size and density of Sea Ranch was 'to invite trouble.' Even under the best of conditions they were said to sometimes fail, contaminating streams and ground water, and generally constituting a health hazard and a threat to the environment....

The probable congestion of traffic on Highway 1 was the subject of the following expert testimony. Already the road 'peaked' at 280 vehicles per hour on summer weekends.... When traffic flows approach a two-way flow of around 400 vehicles per hour the chances of finding a safe passing situation are lost

and drivers become 'trapped.' ... Sea Ranch, at full build-out, could be expected to increase the peak periods to substantially more than 400 vehicles per hour. The Commission had considered the cost and effect of improving the highway; it found: 'Major highway construction in the area would be enormously expensive both in dollar and environmental terms.... And substantial improvement to the highway could require large cuts and fills along this scenic route, and could change the coastal experience from one of driving on an essentially rural road to one of driving on a much more urban roadway.'

Other evidence indicated that little had been done by the subdivider to allow public access through the property to the beaches, and that diversion of water to the subdivision from the well near the Gualala River could unduly jeopardize fish life in, and the flow of, the river." 57 Cal.App.3d at 84–86, 129 Cal.Rptr. at 62–63.

**32.** *Id.* at 92, 129 Cal.Rptr. at 67.