[No. H031283. Sixth Dist. Dec. 30, 2008.]

HUGH McALLISTER, Plaintiff and Appellant, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent;
COUNTY OF MONTEREY et al., Real Parties in Interest and Respondents.

914

COUNSEL

Fenton & Keller, John S. Bridges, David C. Sweigert and Brian E. Turlington for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Tom Greene, Chief Assistant Attorney General, J. Matthew Rodriguez, Assistant Attorney General, and Patricia Sheehan Peterson, Deputy Attorney General, for Defendant and Respondent.

Charles J. McKee, County Counsel, Frank G. Tiesen, Leslie J. Girard and Mary Grace Perry, Deputy County Counsel; Lombardo & Gilles and Sheri L. Damon for Real Parties in Interest and Respondents.

OPINION

RUSHING, P. J.—

## I. INTRODUCTION

This appeal represents the latest skirmish in Dr. Hugh McAllister's battle to stop Sheldon J. Laube and Dr. Nancy J. Engel (Laube and Engel) from building a home on neighboring property visible from his home. Laube and Engel sought a coastal development permit, and the California Coastal Commission (the Commission) granted it. Dr. McAllister now challenges that decision.

The appeal raises myriad issues, one of which implicates two coastal development policies. One policy protects environmentally sensitive habitat areas—in this case, habitat for the Smith's blue butterfly and coastal bluff scrub—by restricting development in those areas to uses that are dependent on habitat resources. Another policy protects property owners from the application of development policies in a way that deprives them of beneficial or productive use of their land and causes an unconstitutional taking without compensation. Under applicable regulations, where the strict application of a development policy would require the denial of a permit, but a denial would cause a taking, the permitting agency may relax the policy and grant a permit if it makes the required findings.

As we explain below, strict application of the policy restricting development in habitat areas to resource-dependent uses would have required the Commission to deny the permit. Nevertheless, the Commission granted it. The Commission now claims that it did so to avoid a taking. However, the

Commission did not make the findings necessary to justify that action or even consider whether denying a permit would constitute a taking. Thus, in granting the permit, the Commission failed to proceed in the manner required by law and abused its discretion. Accordingly, the judgment must be reversed and the matter remanded to the Commission for a new hearing on the permit application at which it can consider the taking and other issues.

## II. STATEMENT OF THE CASE

The Commission approved an application by Laube and Engel for a coastal development permit to build a house on their property (the Project) located on the Big Sur coast in Monterey County. Dr. Hugh McAllister (McAllister) filed a petition for a writ of administrative mandate in the superior court challenging the approval. (Code Civ. Proc., § 1094.5.) The trial court denied the petition.

On appeal from the judgment, McAllister contends that the Commission abused its discretion in granting the permit. He claims the Project does not conform to coastal development policies protecting environmentally sensitive habitat areas, visual and scenic resources, and water resources. He also claims the Commission violated the procedural requirements of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) or and failed to adequately evaluate or mitigate potentially significant individual and cumulative environmental impacts.[1]

As noted, we conclude that the Commission abused its discretion in relaxing a restriction on development in environmentally sensitive habitat areas without making the findings necessary to justify doing so. Accordingly, we reverse the judgment and direct the trial court to grant McAllister's petition for a writ of mandate and remand the matter to the Commission for further proceedings.

## III. FACTUAL AND PROCEDURAL BACKGROUND

In 1977, the Commission granted Donald Sorensen a development permit to build a house on two adjoining parcels on the Big Sur coast at Kasler Point in Monterey County. One condition of Sorensen's permit required that he formally consolidate the two parcels before he started construction. Sorensen commenced construction but later abandoned the project without ever consolidating the parcels. He then sold them.

In 1999, the subsequent owners sold the two parcels to Laube and Engel. Vestiges of Sorensen's prior development remained. In 2001, Laube and Engel

---

[1] All further unspecified statutory references are to the Public Resources Code.

applied to the Monterey County Planning Commission (the Planning Commission) for a permit to build a house and merge the two parcels. The Big Sur Land Use Advisory Committee approved the Project with conditions concerning outside lighting and the removal of invasive vegetation. In response to objections by McAllister, Laube and Engel redesigned and relocated the proposed house and submitted a revised permit application. In March 2003, the land use advisory committee approved the redesign, and in October 2003, the Planning Commission approved the Project and a lot line adjustment to consolidate the two parcels and granted the permit. McAllister appealed the decision to the Monterey County Board of Supervisors (the County). In January 2004, the County upheld the permit.

In February 2004, McAllister appealed the County's decision to the Commission.[2] (§ 30603.) In September 2004, the Commission found that the appeal raised a "substantial issue" concerning the protection of coastal resources and scheduled a de novo hearing on the permit application. (§ 30625, subd. (b)(2); Cal. Code Regs., tit. 14, § 13115, subd. (b).)[3] The de novo hearing took place in December 2004. The Commission approved the Project as redesigned, granted the permit with conditions, and directed staff to prepare findings and conclusion that reflected the Commission's decision.

In January 2005, McAllister filed a second petition for a writ of administrative mandate, this time challenging the Commission's decision. (Code Civ. Proc., § 1094.5.) In April 2005, staff submitted proposed findings, and in May 2005, the Commission adopted them. Thereafter, McAllister amended his writ petition.

In August 2006, the trial court issued an "Intended Decision" granting the petition. All parties filed objections. In December 2006, the court modified its

---

[2] In addition to his administrative appeal, McAllister filed a lawsuit against the County and the Commission for declaratory and injunctive relief and a petition for a writ of administrative mandate in which he challenged the County's decision and sought to prevent the Commission from assuming jurisdiction over the Project. The trial court sustained demurrers by the Commission and Laube and Engel, which the County joined, and dismissed the case. This court affirmed the judgment on appeal. (*McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253 [54 Cal.Rptr.3d 116].)

[3] "If the Commission determines that an appeal presents a 'substantial issue,' the permit application is reviewed de novo; in effect, the Commission hears the application as if no local governmental unit was previously involved, deciding for itself whether the proposed project satisfies legal standards and requirements." (*Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569 [106 Cal.Rptr.2d 14].)

Hereafter, all further references to the California Code of Regulations are to title 14, which will be referred to as the Regulations.

decision and denied the petition. On February 22, 2007, the court entered the judgment from which McAllister now appeals.[4]

## IV. STANDARD OF REVIEW

In reviewing an agency's decision under Code of Civil Procedure section 1094.5, the trial court determines whether (1) the agency proceeded without, or in excess of, jurisdiction; (2) there was a fair hearing; and (3) the agency abused its discretion. (*La Costa Beach Homeowners' Assn. v. California Coastal Com.* (2002) 101 Cal.App.4th 804, 814 [124 Cal.Rptr.2d 618] (*La Costa*)). An " '[a]buse of discretion is established if the [agency failed to proceed] in the manner required by law, [its] order or decision is not supported by the findings, or the findings are not supported by the evidence.' " (*Ibid.*; *Eden Hospital Dist. v. Belshé* (1998) 65 Cal.App.4th 908, 915–916 [76 Cal.Rptr.2d 857]; § 30801; Code Civ. Proc., § 1094.5, subd. (b).)

The trial court presumes that the agency's decision is supported by substantial evidence, and the petitioner bears the burden of demonstrating the contrary. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 336 [25 Cal.Rptr.2d 842]; *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212 [30 Cal.Rptr.2d 95].) In reviewing the agency's decision, the trial court examines the whole record and considers all relevant evidence, including evidence that detracts from the decision. (*Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 503 [83 Cal.Rptr.2d 850] (*Bolsa Chica*).) "Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the [agency] to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it." (*Kirkorowicz v. California Coastal Com.* (2000) 83 Cal.App.4th 980, 986 [100 Cal.Rptr.2d 124]; see *Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1077–1078 [114 Cal.Rptr.2d 798] [review of an agency's factual determinations is deferential and all doubts and inferences are resolved in favor of the agency].) On the other hand, the trial court exercises independent judgment on pure questions of law, including the interpretation of statutes and judicial

---

[4] Although the County was involved during the initial stages of the permit process, its formal involvement in the process ended when the Commission accepted McAllister's appeal and assumed de novo jurisdiction over the permit application.

In his appeal from the judgment, McAllister does not seek relief against the County. Thus, the County is neither an aggrieved party, a respondent, or technically a real party in interest. Nevertheless, the County has filed a respondent's brief in support of Laube and Engel and the Commission and urges us to affirm the judgment.

precedent. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800–801 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *Donaldson v. Department of Real Estate* (2005) 134 Cal.App.4th 948, 954 [36 Cal.Rptr.3d 577].)

On appeal from the denial of a petition, our role is identical to that of the trial court. (*Bolsa Chica, supra,* 71 Cal.App.4th at p. 503; *Saad v. City of Berkeley, supra,* 24 Cal.App.4th at p. 1212; *Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 610 [15 Cal.Rptr.2d 779] (*Sierra Club*).)

As noted, McAllister contends that the Commission abused its discretion in finding that the Project conforms to the applicable state and local regulatory policies concerning protection of environmentally sensitive habitat areas, visual and scenic resources, and water resources.

## V. COASTAL ACT AND LOCAL COASTAL PROGRAM POLICIES

### A. SOURCE OF POLICIES

The California Coastal Act of 1976 (the Coastal Act or Act) (§ 30000 et seq.) provides "a comprehensive scheme to govern land use planning for the entire coastal zone of California." (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565 [205 Cal.Rptr. 801, 685 P.2d 1152].) One of its goals is to "[p]rotect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and artificial resources." (§ 30001.5, subd. (a).) To achieve this goal, the Act sets forth specific policies governing public access, recreation, the marine environment, land resources, and development along the coast. (§§ 30210–30265.5.)

"The Coastal Act creates a shared responsibility between local governments and the Coastal Commission for the planning of coastal development. Local governments are required to Develop Local Coastal Programs (LCPs) that consist of policies and plans for coastal development within the coastal areas of their jurisdiction." (4 Manaster & Selmi, Cal. Environmental Law and Land Use Practice (2008) Coastal Zone Regulation, § 66.20, p. 66-29, fn. omitted (4 Manaster & Selmi); see *Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1344 [44 Cal.Rptr.3d 867].)

A local coastal program includes a land use plan, which functions as the general plan for property in the coastal zone; and a local implementation plan, which includes the zoning, zoning maps, and other implementing actions for the coastal zone. (§§ 30108.5, 30108.6.) After a local government prepares its local coastal program, the Commission reviews it. If satisfied that it conforms to the policies and standards of the Act, the Commission certifies it. (§§ 30512, subd. (c), 30513; *Santa Barbara County Flower & Nursery*

*Growers Assn. v. County of Santa Barbara* (2004) 121 Cal.App.4th 864, 871–872 [17 Cal.Rptr.3d 489]; 4 Manaster & Selmi, *supra*, § 66.20, pp. 66-29 to 66-35.)

In 1985, the County adopted the Monterey County Local Coastal Program, which included the Big Sur Land Use Plan and a local implementation plan, which is codified in title 20 of the Monterey County Zoning Ordinance as the "Coastal Zoning Ordinance" and sets forth the specific regulations implementing the Big Sur Land Use Plan.[5] (Coastal Zoning Ord., § 20.02.010; Coastal Implementation Plan, § 20.145 et seq.) The Commission certified the Monterey County Local Coastal Program in 1986.

### B. Conformance with Habitat Policies

#### 1. Policies Governing Development in Habitat Areas

■ The Coastal Act reflects " ' "a strong rule of policy, adopted for the benefit of the public" ' that implicate[s] matters of vital interest." (*Feduniak v. California Coastal Commission* (2007) 148 Cal.App.4th 1346, 1376 [56 Cal.Rptr.3d 591] (*Feduniak*), quoting *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493 [91 Cal.Rptr. 23, 476 P.2d 423].) The Act provides heightened protection for areas that are designated "environmentally sensitive habitat areas" (habitat areas) and establishes strict preferences and priorities that guide development in them.[6] (§ 30240; see *Sierra Club, supra*, 12 Cal.App.4th at p. 611.) Specifically, section 30240 provides: "(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas. [¶] (b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas."

In accordance with section 30240, section 3.3 of the Big Sur Land Use Plan observes that "[e]nvironmentally sensitive habitats are areas in which

---

[5] We have granted the parties' requests for judicial notice of various sections of the Big Sur Land Use Plan and Coastal Zoning Ordinance, and we shall take judicial notice of the entirety of both. (Evid. Code, § 452, subd. (b) [enactments by public entity]; *Jordan v. County of Los Angeles* (1968) 267 Cal.App.2d 794, 798 [73 Cal.Rptr. 516] [same]; e.g., *Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 647, fn. 13 [79 Cal.Rptr.3d 383] [taking judicial notice of county ordinances].)

[6] Section 30107.5 defines "environmentally sensitive area" to mean "any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments."

plant or animal life or their habitats are rare or particularly valuable because of their special nature or role in an ecosystem" and acknowledges that "[t]he California Coastal Act limits uses [in habitat areas] to those which are dependent on such resources: examples include nature education and research, hunting, fishing, and aquaculture." (See Coastal Implementation Plan, § 20.145.020.EE [same].)

Section 3.3.1 of the Big Sur Land Use Plan states that the "Key Policy" guiding development in habitat areas is that "[a]ll practical efforts shall be made to maintain, restore, and if possible, enhance Big Sur's environmentally sensitive habitats. The development of all categories of land use, both public and private, should be subordinate to the protection of these critical areas." (See Coastal Implementation Plan, § 20.145.040.)

Section 3.3.2 of the Big Sur Land Use Plan establishes the "General Policies" controlling development in habitat areas. Specifically, section 3.3.2.1 of the Big Sur Land Use Plan provides, "Development, including vegetation removal, excavation, grading, fil[l]ing, and the construction of roads and structures, shall not be permitted in environmentally sensitive areas if it results in any potential disruption of habitat value. To approve development within any of these habitats the County must find that disruption of a habitat caused by the development is not significant." (See Coastal Implementation Plan, § 20.145.020.) Section 3.3.2.2 of the Big Sur Land Use Plan provides, "Where private or public development is proposed, in documented or expected locations of environmentally sensitive habitats, field surveys by qualified individuals or agencies shall be made in order to determine precise locations of the habitat and to recommend mitigating measures to ensure its protection." Section 3.3.2.4 of the Big Sur Land Use Plan provides, "For developments approved within environmentally sensitive habitats, the removal of indigenous vegetation and land disturbance (grading, excavation, paving, etc.) associated with the development shall be limited to that needed for the structural improvements themselves. The guiding philosophy shall be to limit the area of disturbance, to maximize the maintenance of the natural topography of the site, and to favor structural designs which achieve these goals."

### 2. THE COMMISSION'S FINDINGS

In its findings, the Commission noted that the Big Sur Land Use Plan requires that "all practical effort . . . be made to maintain, restore, and if possible enhance" habitat areas and prohibits development in them "if it results in any potential disruption of habitat value . . . ." Thus, the Commission opined that in order for the Project to conform to applicable

habitat policies, it could not significantly disrupt any habitat and must "mitigate for unavoidable impacts that do not cause a significant disruption of habitat."

Turning to the Project, the Commission found that it is located in, and had the potential to disrupt, two habitat areas—the Smith's blue butterfly habitat and the coastal bluff scrub habitat. The Commission explained that the site is located in the middle of the coastal range for the Smith's blue butterfly, which is on the federal endangered species list, and the Project could affect between 28 and 111 seacliff buckwheat plants, one of only two species of host plants for the butterflies. Thus, the Project and associated construction could diminish potential butterfly habitat.[7] However, the Commission found that although the removal of buckwheat plants would eliminate some butterfly habitat, their removal would be limited to that necessary to build the Project. The Commission further found that, as mitigation, the Project would be required to enlarge the remaining habitat by planting three times the number of buckwheat plants that would have to be removed.

Next, the Commission observed that California's Department of Fish and Game considers the coastal bluff scrub habitat to be a threatened plant community. However, the Commission noted that the prior Sorensen excavation had already severely degraded the scrub habitat in the area of the proposed house, and invasive exotic plants had taken over most of the coastal terrace seaward of the building site. Thus, the Commission opined that the impact of the Project on the bluff scrub habitat would be minimal and mitigated by a requirement that the Project remove the invasive plants and restore an area equal to the footprint of the house with native plants appropriate to the coastal bluff.

In all, the Commission concluded that the Project would have a potentially negative impact on the two habitat areas, but the mitigation measures reduced those impacts to a level of insignificance, and, therefore the Project conformed to habitat area policies.

### 3. PERMISSIBILITY OF PROJECT IN HABITAT AREA

In his opening and reply briefs, McAllister asserted that the habitat policies in the Big Sur Land Use Plan must be interpreted in a way that is consistent with section 30240, subdivision (a) (section 30240(a)), that is, they must

---

[7] The report noted that various surveys conducted at the property in two different years did not reveal the presence of any Smith's blue butterflies. However, the report further noted that the butterflies had been located on adjoining property and the nearby Garrapata Creek watershed and explained that negative survey results are not conclusive of whether butterflies use a particular area.

incorporate the statutory ·restriction on development in habitat areas to resource-dependent uses. Thus, McAllister claimed that the Commission erred in finding that the Project conformed to the habitat area policies because the Project is not a resource-dependent use.

In response, the Commission and Laube and Engel asserted that, after the Commission certified the Monterey County Local Coastal Program in 1986, development in habitat areas was governed by the Big Sur Land Use Plan and not section 30240(a). Thus, when the Commission reviewed the Project, section 30240(a) was irrelevant. The only issue was whether the Project conformed to the Big Sur Land Use Plan. (§ 30604, subd. (b).)[8] The Commission and Laube and Engel argued that the Project conformed because (1) disruption of the two habitat areas was limited to what was necessary to build the Project, and (2) mitigation measures reduced disruption of the habitat areas to a level of insignificance. (Big Sur Land Use Plan, §§ 3.3.2.1, 3.3.2.2, 3.3.2.4; Coastal Implementation Plan, § 20.145.020.)

Laube and Engel further questioned whether the site was in a butterfly habitat area. They noted that, despite the biological surveys conducted at the site, no butterflies were ever observed there.

We requested further briefing on a number of issues, including the following: Did the Commission find that the Project was within habitat areas? What is the meaning of section 30240(a)? And should this court assume that (1) the County intended the Monterey County Local Coastal Program to include the developmental restrictions of section 30240(a) and (2) the Commission certified the program with the understanding that it included those restrictions? We discuss these issues below.

a. HABITAT AREAS

The Commission acknowledges its determination that the Project was located within two habitat areas. In particular, the Commission notes its findings that, in general, seacliff buckwheat plants provide habitat for the Smith's blue butterfly; the Project site is in the middle of the butterfly's coastal range; there were more than 900 seacliff buckwheat plants on the Project site; some of those plants were in the area of the existing driveway and footprint of the proposed house; and, although field surveys had not reported the presence of butterflies at the site, the site may and could provide habitat and thus constituted a protected habitat area. The Commission further notes its findings that the entire site is part of the greater habitat for coastal

---

[8] Section 30604, subdivision (b) provides, "After certification of the local coastal program, a coastal development permit shall be issued if the issuing agency or the commission on appeal finds that the proposed development is in conformity with the certified local coastal program."

bluff scrub, even though there was no bluff scrub in the building envelope because of prior excavation and grading and the growth of invasive ice plant.

Laube and Engel now opine that the Commission's determination concerning the habitat areas was "inaccurate" and reflected "imprecise wording." They claim that although the "the project site as a whole included [a habitat area] which included buckwheat plants," the Commission did not find that the entire building envelope or the buckwheat plants within it constituted protected habitat areas. They also reiterate their argument that because no butterflies have been observed at the site, and there are only a few buckwheat plants and no bluff scrub within the building envelope, that envelope area cannot be considered a habitat area. Indeed, at oral argument, Laube and Engel suggested that the Commission abused its discretion in determining that buckwheat plants represented a habitat area.

We find nothing imprecise or inaccurate about the Commission's habitat findings and no abuse of discretion. Concerning the butterfly habitat, the record amply supports the Commission's findings noted above. Moreover, the record supports a finding that the failure to observe butterflies during surveys at the site does not, standing alone, mean that the area is not butterfly habitat or potential habitat.

Concerning the coastal bluff scrub habitat, Laube and Engel provide no authority for the proposition that the destruction of a protected or endangered plant species in one section of a habitat area either precludes a finding that that particular section is a habitat area or is within a habitat area or exempts that section from the development restrictions. Moreover, we reject this view because it would hasten the piecemeal shrinkage of a habitat area by encouraging the covert destruction of developmentally desirable areas in habitat areas to render them subject to less restrictive habitat policies. Such a consequence is inconsistent with a fundamental goal of the Coastal Act to "[p]rotect, maintain, and, where feasible, enhance *and restore* the overall quality of the coastal zone environment and its natural and artificial resources." (§ 30001.5, subd. (a), italics added.)

Under the circumstances, the record supports the Commission's findings that the Project had the potential to disrupt habitat areas and was, therefore, subject to the policies governing development in habitat areas.

We agree with the Commission and Laube and Engel that, in determining conformance with habitat policies, the Commission applies only at the Monterey County Local Coastal Program. (§ 30604, subd. (b).) However, if, as McAllister claims, that program incorporated the development restrictions in section 30240(a), then the Commission had to determine conformance with

those statutory restrictions. Thus, we first discuss the meaning of section 30240(a) and then whether its provisions were incorporated into the Monterey County Local Coastal Program.

### b. THE MEANING OF SECTION 30240(a)

■ When we interpret the meaning of statutes, our fundamental task is to ascertain the aim and goal of the lawmakers so as to effectuate the purpose of the statute. We begin by examining the statutory language, giving the words their usual and ordinary meaning. If we find no ambiguity, we presume that the lawmakers meant what they said, and the plain meaning of the language governs. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) If, on the other hand, the statutory language is unclear or ambiguous and permits more than one reasonable interpretation, we may consider various extrinsic aids to help us ascertain the lawmakers' intent, including legislative history, public policy, settled rules of statutory construction, and an examination of the evils to be remedied and the legislative scheme encompassing the statute in question. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 749 [69 Cal.Rptr.3d 365].) In such circumstances, we must select the construction that comports most closely with the aim and goal of the Legislature to promote rather than defeat the statute's general purpose and avoid an interpretation that would lead to absurd and unintended consequences. (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 46 [100 Cal.Rptr.2d 627].)

When a provision of the Coastal Act is at issue, we are enjoined to construe it liberally to accomplish its purposes and objectives, giving the highest priority to environmental considerations. (§ 30009; *Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1294 [38 Cal.Rptr.3d 316]; *Bolsa Chica, supra,* 71 Cal.App.4th at p. 506; *Coastal Southwest Dev. Corp. v. California Coastal Zone Conservation Com.* (1976) 55 Cal.App.3d 525, 537 [127 Cal.Rptr. 775].)

■ The language of section 30240(a) is simple and direct: "Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, *and* only uses dependent on those resources shall be allowed within those areas." (Italics added.) The statute unambiguously establishes two restrictions on development in habitat areas: (1) there can be no significant disruption of habitat values; and (2) only resource-dependent uses are allowed. The only potential ambiguity involves the phrase "those resources," which does not refer back to a list of resources. However, the context makes it clear that the phrase could only be referring to the resources that make an area a protected habitat—i.e., "plant or animal life or their habitats [that] are either rare or especially valuable because of their special nature or role in an ecosystem . . . ." (§ 30107.5.)

Thus, together, the two restrictions limit development inside habitat areas to uses that are dependent on the resources to be protected and that do not significantly disrupt habitat values. This interpretation not only reflects the plain meaning of the statutory language but also harmonizes the two parts of section 30240(a) in the only way that makes sense, protects habitat areas, promotes the goals of the Coastal Act, and complies with our mandate to construe the Coastal Act liberally to achieve its purposes and objective.

*Sierra Club, supra*, 12 Cal.App.4th 602 supports our interpretation. There, the Commission certified a land use plan that failed to designate areas of pygmy forest along the Mendocino coast as protected habitat. As noted, under section 30107.5, a protected habitat is both (1) "rare or especially valuable" and (2) "easily disturbed or degraded by human activities and developments." In claiming that the pygmy forest areas did not qualify as protected habitat, the Commission argued that the second requirement meant " 'easily disturbed or degraded by [well-controlled] developments.' " (12 Cal.App.4th at p. 617.) Thus, if well-controlled development would not disturb or degrade the area, then the area was not entitled to protection as a habitat area.

The court disagreed. It noted that section 30240(a) protected habitat areas against significant disruption of habitat values *and* permitted only resource-dependent uses in habitat areas. The court opined that the Commission's interpretation distorted the statutory language and would halve the habitat protection provided by section 30240(a) by effectively eliminating the restriction to resource-dependent uses. The court explained that "[habitat area] status demands (1) protection against significant disruption of habitat values and (2) allowance of resource-dependent uses only (§ 30240, subd. (a)). If [environmentally sensitive habitat area] status could be avoided by having only 'well-controlled' development—which in essence protects against significant disruption (i.e., protection (1))—the habitat would never be restricted to resource-dependent uses (i.e., protection (2)). That violates the Act, which in demanding protection against 'significant disruption' assumes that this protection is *in addition to* the use limitation. The [land use plan] in this case, for example, may provide significant habitat protection, but it allows non-resource-dependent (residential) development in violation of the Act." (*Sierra Club, supra*, 12 Cal.App.4th at p. 617, original italics.) In other words, "development in [environmentally sensitive habitat area] areas themselves is limited to uses dependent on those resources . . . ." (*Id.* at p. 611; accord, *Feduniak, supra*, 148 Cal.App.4th at p. 1376; *Bolsa Chica, supra*, 71 Cal.App.4th at p. 507.)

Understandably, the Commission agrees that, under section 30240(a), "only resource-dependent uses are allowed within [habitat areas] and only when such uses do not significantly disrupt the habitat value of the [habitat area]."

Laube and Engel propose a much different interpretation. "[F]irst the Commission must find that there [*sic*] proposed development will not cause 'a significant disruption of habitat values' and if the area is determined to be [a habitat area] that causes significant disruption, then only dependent uses on those resources may be allowed, including habitat enhancement projects." It is not altogether clear what Laube and Engel mean, but they appear to say that any type of development is allowed within a habitat area as long as it will not significantly disrupt habitat values; however, if development will cause significant disruption, then only resource-dependent uses are permitted.

Laube and Engel provide no authority for this interpretation, and we find it to be a strained and unreasonable reading of otherwise clear statutory language. It erroneously gives secondary status to the resource-dependent-use restriction by making it applicable only when development will significantly disrupt habitat value. However, the use of "and" in section 30240(a) to conjoin the two restrictions means that they both apply equally to any development in habitat areas. (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 861 [80 Cal.Rptr.2d 803, 968 P.2d 514] ["and" requires conjunctive construction of two requirements]; e.g., *Rodriguez v. Blue Cross of California* (2008) 162 Cal.App.4th 330, 341 [75 Cal.Rptr.3d 754].) Finally, the notion that resource-dependent uses are allowed even if they cause significant disruption is inconsistent with the statutory mandate that habitat areas be protected against any significant disruption.

Mindful of the meaning of section 30240(a), we now discuss whether the Monterey County Local Coastal Program incorporated its development restrictions.

### c. Incorporation of Restrictions

■ Although local governments are responsible for drafting the "precise content" of their local coastal programs (§ 30500, subd. (c)), those programs must, at a minimum, conform to and not conflict with the resource management standards and policies of the Act.[9] (§§ 30005, subd. (a), 30200, subd. (a), 30514, subd. (a); *Yost v. Thomas, supra,* 36 Cal.3d at p. 572.)

■ Generally, "[w]e presume that the Legislature, when enacting a statute, was aware of existing related laws and intended to maintain a consistent body of rules." (*Stone Street Capital, LLC v. California State*

---

[9] A local coastal program need not be identical to the Coastal Act. As long as a local coastal program is not inconsistent with the Coastal Act, it can be more restrictive. (*Yost v. Thomas, supra,* 36 Cal.3d at pp. 572, 573; *Dunn v. County of Santa Barbara, supra,* 135 Cal.App.4th at p. 1297.)

*Lottery Com.* (2008) 165 Cal.App.4th 109, 118 [80 Cal.Rptr.3d 326].) The presumption applies as well to County legislation. Thus, we presume the County was aware that the Coastal Act established the minimum standards and policies for local coastal programs and knew that, in drafting its local coastal program, it was constrained to incorporate both development restrictions in section 30240(a). Accordingly, we assume that, as required, the County intended to and did incorporate those restrictions.

■ Next, when the Commission reviews a local coastal program for certification, its task is to determine whether it conforms to the minimum policies established in the Coastal Act. (§§ 30512, 30512.2, 30513.) ■ In the absence of evidence to the contrary, we presume that an agency carries out its official obligations. (Evid. Code, § 664; *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 976 [3 Cal.Rptr.2d 643]; e.g., *Healing v. California Coastal Com.* (1994) 22 Cal.App.4th 1158, 1167 [27 Cal.Rptr.2d 758].) Thus, we also assume that, in certifying the Monterey County Local Coastal Program, the Commission understood and found that it conformed to—i.e., incorporated—the minimum policies and standards of the Coastal Act, including the development restrictions in section 30240(a).

Finally, section 3.3 of the Big Sur Land Use Plan expressly acknowledges that the Coastal Act limits uses in habitat areas to those dependent on habitat resources. The specific provisions that follow do not expressly authorize non-resource-dependent uses within a habitat area or purport to relax that restriction. Indeed, such provisions would be inconsistent with and directly conflict with section 30240(a). For this reason, the Commission now opines that it would be "inappropriate to construe the [Monterey County Local Coastal Program] as authorizing *any* use of [habitat area] so long as it does not significantly disrupt habitat values if the use is not resource-dependent." (Italics added.) Moreover, the provisions of the Big Sur Land Use Plan and Coastal Zoning Ordinance concerning development in habitat areas are not incompatible with the restrictions in section 30240(a). Although those provisions refer generally to "development" and "public and private" development in habitat areas (Big Sur Land Use Plan, §§ 3.3.1, 3.3.2.1, 3.3.2.2, 3.3.2.4; Coastal Implementation Plan, § 20.145.040), they must be read together and harmonized with the incorporated development restrictions, which, in turn, necessarily narrow their scope and meaning to permissible—i.e., resource—dependent-public and private development or uses. (*People v. King* (1993) 5 Cal.4th 59, 69 [19 Cal.Rptr.2d 233, 851 P.2d 27] [related provisions harmonized to give both effect].)

Under the circumstances, we conclude that, in accordance with section 30240(a), the Monterey County Local Coastal Program policies governing

habitat areas restrict development to resource-dependent uses that do not significantly disrupt habitat values.

In its letter brief, the Commission agrees with our analysis and concedes that the two restrictions were applicable in determining whether the Project conformed to the governing habitat policies.

Laube and Engel similarly opine that "[t]he court must presume that, in adopting the [Monterey County Local Coastal Program], Monterey County and, in certifying [the program], the Commission intended and understood the [Big Sur Land Use Plan] terms and policies to conform to the limitations in Section 30240. This judicial presumption is required because when the Coastal Commission reviewed Monterey County's [local coastal program], the Commission was required only to determine whether the [program] meets the requirements of Chapter 3 [of the Coastal Act], including section 30240."

It follows that in reviewing whether the Project conformed to the provisions of the Monterey County Local Coastal Program, the Commission had to determine whether it conformed to the incorporated statutory restrictions on development in habitat areas.

### d. CONFORMANCE WITH THE DEVELOPMENT RESTRICTIONS

As noted, the Commission concluded that the Project conformed to habitat policies because the permit conditions rendered its impacts on the habitat areas insignificant and also required restoration of previously degraded habitat. These finding address one of the development restrictions: the requirement that habitat area values be protected against significant disruption.

█ In this regard, however, we observe that in *Bolsa Chica, supra,* 71 Cal.App.4th 493, the Commission certified a local coastal program that allowed for residential development within part of a eucalyptus grove that had been designated a habitat area for raptors. The program provided for the creation of a new raptor habitat nearby. In approving the program, the Commission opined that section 30240(a) protected only habitat *values.* Thus, since the existing habitat was deteriorating, residential development there was permissible because the best way to protect and promote the habitat values was to remove the existing habitat and plant a new one. (71 Cal.App.4th at p. 507.) In rejecting this approach, the court noted that section 30240 protects habitat *areas*, not just habitat values. Thus, the statute does not authorize the separation of habitat values from an existing habitat and the relocation of those values elsewhere as a form of protective mitigation. Rather, the statute

protected the designated habitat area itself, regardless of its continued viability, and mitigation measures could not be used to circumvent the statute's strict limits on the uses permissible in habitat areas. (71 Cal.App.4th at pp. 507–508.)

*Bolsa Chica* suggests that here, the removal of some of the seacliff buckwheat from the building envelope and replanting more elsewhere disrupts, rather than protects, the butterfly habitat area. However, unlike the situation in *Bolsa Chica*, where the entire habitat was removed and relocated, here, only a very limited number of plants would have to be removed. For that reason and because of the additional restoration measures, the Commission could reasonably conclude that the Project would cause no *significant* disruption and thus conform to one of the development restrictions.

However, the Commission did not, and could not, find that the Project conformed to the resource-dependent use restriction. Like the residential development in *Bolsa Chica*, Laube and Engel's proposed house is not dependent on the resources that render the area a protected habitat. The Commission agrees, conceding that "strict application of the [Monterey County Local Coastal Program] [habitat area] policies would require a decision to *deny* the proposed residential development because it is not a resource-dependent use." (Italics added.)

Laube and Engel and the County disagree. Laube and Engel first claim that restoration and enhancement of a habitat are permissible resource-dependent uses, and, therefore, the permit conditions requiring preservation, restoration, and enhancement of habitat render the Project resource dependent. This claim mischaracterizes the nature of the Project.

The Project is not a habitat restoration project. Its purpose is to build a house for residential use, and such a use is not dependent on the seacliff buckwheat or bluff scrub. Nor is building a residence akin to the uses identified as permissible in the Big Sur Land Use Plan and Coastal Zoning Ordinance or those suggested by the Commission in its letter brief, such as hiking trails, and habitat improvement and restoration projects. The fact that the Project includes enhancement, maintenance, and restoration measures does not convert its residential purpose into a resource-dependent use.

Laube and Engel alternatively claim that the resource-dependent-use restriction is simply not applicable to the Project because "[t]he Big Sur certified [Monterey County Local Coastal Program] provides exceptions for development on vacant parcels in residential enclaves that existed prior to [Monterey County Local Coastal Program] certification . . . ."

Laube and Engel are referring to a section of coastline designated "the Rocky Point exception area" (the Rocky Point area). Resolving this claim requires additional background.

In separate chapters, the Big Sur Land Use Plan establishes policies and standards governing the protection and management of scenic resources, habitat areas, water resources, forest resources, agriculture, hazardous areas, mineral resources, dredging, historical resources, and archaeological resources. The Key Policy governing the protection of visual and scenic resources prohibits any development that is visible in an area called the "critical viewshed"—i.e., everything within sight of Highway 1 and major public viewing areas. However, certain areas are exempted from this Key Policy and governed by less stringent visual policies. One such area is the Rocky Point area, where the Project is located. Pertinent here is section 3.2.5.F of the Big Sur Land Use Plan which provides that existing vacant residential parcels in this area *shall be permitted to be used for residential purposes* subject to policies of Section 3.2.4 of this plan and the following standards." (Italics added; see Coastal Implementation Plan, § 20.145.030(B)(6) [same].)

Relying on this provision, Laube and Engel claim the Rocky Point area is also exempt from habitat area development policies, including the resource-dependent-use restriction. However, their reliance is misplaced.

The Rocky Point area is recognized in section 3.2.5.F of the Big Sur Land Use Plan, which is part of the chapter governing *visual and scenic resources*. Although the scenic and visual policies exempt the Rocky Point area from the key visibility policy, they nevertheless set forth alternative, albeit less stringent, visibility policies. None of the visual and scenic policies refer to habitat area policies or restrictions or purport to exempt the Rocky Point area from them. On the other hand, the habitat area policies do not recognize the Rocky Point area by name, refer to section 3.2.5.F of the Big Sur Land Use Plan, or include a similar section that recognizes the Rocky Point area and specifies that residential use shall be permitted in habitat areas. Nor do the habitat policies exempt the Rocky Point area (or any area) from habitat area development policies and restrictions or provide alternative habitat development policies for certain exempt areas.

■ In construing statutes, we are guided by a general rule that "if a statute on a particular subject omits a particular provision, inclusion of that provision in another related statute indicates an intent the provision is not applicable to the statute from which it was omitted." (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1827 [46 Cal.Rptr.2d 198].) Moreover, exceptions to a statute are construed narrowly to cover only situations that are "within the

words and reason of the exception." (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 20 [22 Cal.Rptr.2d 229].) The circumstances here are analogous. The creation of an exemption for the Rocky Point area from the key visual policy and the lack of a similar exemption from any of the habit policies reflect an intent not to exempt the Rocky Point area from restrictions on development in habitat areas. We decline to infer such an exemption. Moreover, given the specific focus of the exemption from the key visual policy, we further decline to expand it beyond visual policies to include an exemption from habitat development policies. Thus, although for the purpose of implementing visual and scenic policies, section 3.2.5.F of the Big Sur Land Use Plan provides that residential use shall be permitted in the Rocky Point area, that section does not reasonably authorize residential use in habitat areas.

At oral argument, the County asserted a related claim. In zoning the Rocky Point area for rural residential use, the County, in effect, established housing as a resource-dependent use, in that the zoning designation is a Rocky Point area resource, and people who want to enjoy living in the rural environment along the coast depend on the zoning designation to do so. The County further notes that the zoning designation was part of the Monterey County Local Coastal Program when it was certified in 1986. Thus, the County argues that it is too late for McAllister to challenge the zoning designation or claim that the Project is not a resource-dependent use.

We agree that it is too late for McAllister to challenge the zoning designation. However, we do not find it too late to challenge conformance with the resource-dependent-use restriction. In particular, we reject the County's view that certification of the Monterey County Local Coastal Program established housing as a resource-dependent use. Resource dependency is not such a malleable concept. It arises only in the context of habitat policies embodied in section 30240(a) and incorporated into the Monterey County Local Coastal Program. Habitat policy in general and the resource-dependent use restriction in particular are not concerned with every attribute of an area, including its zoning designation, rural character, and visual and scenic resources. Rather, they focus on those particular resources that play a special role in an ecosystem and qualify an area as an environmentally sensitive habitat. Moreover, the restriction is designed to *limit* the types of development to uses dependent on those particular resources. Given the purpose of the restriction, we reject the view that the rural residential zoning designation broadened the meaning of resource dependency in the Rocky Point area and *expanded* the types of permissible development to include residential use.

Finally, neither the County nor Laube and Engel cite any provision in the Monterey County Local Coastal Program suggesting that a general rural

residential zoning designation necessarily negates the specific resource-dependent-use restriction for habitat areas within the zoning designation or was intended to do so. Rather the zoning designation and resource-dependent-use restriction should be read together and the latter understood as a specific exception for areas within a zoning designation that are entitled to heightened protection as habitat areas.

Laube and Engel offer yet another zoning-related justification for the Commission's finding of conformance with habitat area policies. They note that while section 30240(a) restricts development in habitat areas, section 30250 requires that new residential development be concentrated near existing residential development to maximize the amount of open space that remains undeveloped.[10] They further note that when the Commission reviews a proposed development and encounters a conflict between two developmental policies, it must resolve the conflict under section 30007.5. That section provides, "The Legislature further finds and recognizes that conflicts may occur between one or more policies of the division. The Legislature therefore declares that in carrying out the provisions of this division such conflicts be resolved in a manner which on balance is the most protective of significant coastal resources. In this context, the Legislature declares that broader policies which, for example, serve to concentrate development in close proximity to urban and employment centers may be more protective, overall, than specific wildlife habitat and other similar resource policies."

Laube and Engel argue that here, the Commission resolved the conflict between sections 30240 and 30250—i.e., between the resource-dependent-use restriction in habitat areas and the zoning designation of the Rocky Point area—in favor of authorizing a non-resource-dependent residential development that would not significantly disrupt the habitat area. We disagree for two reasons.

First, the policies of sections 30240 and 30250, and, more specifically, the resource-dependent-use restriction in habitat areas and the general zoning designation for the Rocky Point area are not necessarily in conflict. The zoning designation and use restriction are part of the overall Monterey County Local Coastal Plan. And, as noted above, they can be read as complementary rather than conflicting and harmonized to allow residential development throughout the zoning designation except in areas that are

---

[10] Section 30250, subdivision (a) provides, in relevant part, "New residential, commercial, or industrial development, except as otherwise provided in this division, shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it or, where such areas are not able to accommodate it, in other areas with adequate public services and where it will not have significant adverse effects, either individually or cumulatively, on coastal resources."

entitled to heightened protection as environmentally sensitive habitat. Such a reading promotes the policies of both sections 30240 and 30250.

Second, and more importantly, the record does not indicate that the Commission perceived and resolved a conflict between the two development policies. Section 30200, subdivision (b) provides that if the Commission or any local government implementing the development provision identifies a conflict between the development policies, "Section 30007.5 shall be utilized to resolve the conflict *and the resolution of such conflicts shall be supported by appropriate findings setting forth the basis for the resolution of identified policy conflicts.*" (Italics added.)

In its findings, the Commission did not expressly identify a conflict or acknowledge the possibility of a conflict between the general zoning designation and the restrictions on development in habitat areas. Nor do its findings discuss the zoning designation or the restriction to resource-dependent uses. Moreover, even if we assume for purposes of argument that the Commission implicitly identified a conflict, its findings do not include an analysis of the conflict setting forth the basis of its resolution. Rather, the Commission simply found that the Project conformed to habitat policies. Under the circumstances, the record does not establish, in finding conformance, the Commission balanced the policies as required under section 30007.5. Indeed, the Commission does not now assert that it did so.

e. Excusing Strict Conformance with Habitat Policies to
Avoid a Taking

The Commission does not join the various claims asserted by Laube and Engel and the County to justify the finding of conformance with habitat policies. Rather, the Commission claims that it was compelled to relax the resource-dependent-use restriction and approve the Project in order to avoid an unconstitutional taking of Laube and Engel's property without compensation. Again, we provide additional background to help explain our analysis of this claim.

 "The state and federal Constitutions prohibit government from taking private property for public use without just compensation." (*Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 773 [66 Cal.Rptr.2d 672, 941 P.2d 851]; see Cal. Const., art. I, § 19; U.S. Const., 5th Amend.; *Chicago, Burlington &c. R'D v. Chicago* (1897) 166 U.S. 226, 239 [41 L.Ed. 979, 17 S.Ct. 581] [applying the federal takings clause to the states].) It is settled that a land use regulation constitutes a taking that requires compensation if its application denies an owner economically viable use of his or her land. (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 617–618 [150 L.Ed.2d 592,

121 S.Ct. 2448]; *NJD, Ltd. v. City of San Dimas* (2003) 110 Cal.App.4th 1428, 1436–1438 [2 Cal.Rptr.3d 818]; e.g., *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1016 [120 L.Ed.2d 798, 112 S.Ct. 2886] [denial of permit caused a taking]; *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825, 837 [97 L.Ed.2d 677, 107 S.Ct. 3141] [permit condition lacking nexus to legitimate state interest caused a taking]; *Dolan v. City of Tigard* (1994) 512 U.S. 374, 394–395 [129 L.Ed.2d 304, 114 S.Ct. 2309] [permit condition lacking rough proportionality to expected impacts of project caused a taking].)

 In *Palazzolo v. Rhode Island, supra,* 533 U.S. 606, the United States Supreme Court recently summarized the guidelines to be followed by "courts confronted with deciding whether a particular government action goes too far and effects a regulatory taking. First, we have observed, with certain qualifications . . . that a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause. [Citations.] Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. [Citation.] These inquiries are informed by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Id.* at pp. 617–618.)

In enacting the Coastal Act, the Legislature anticipated that the application of development restrictions to deny a coastal development permit could deprive a property owner of the beneficial use of his or her land and thereby cause an unconstitutional taking. (4 Manaster & Selmi, *supra,* § 66.57, pp. 66-93 to 66-96.) Consequently, the Legislature enacted section 30010 which provides, in relevant part, "The Legislature hereby finds and declares that this division is not intended, and shall not be construed as authorizing the commission, port governing body, or local government acting pursuant to this division to exercise their power to grant or deny a permit in a manner which will take or damage private property for public use, without the payment of just compensation therefor."

In conformity with the section 30100, section 20.02.040 of the Coastal Zoning Ordinance provides, in relevant part, that the Coastal Zoning Ordinance "is not intended and shall not be construed as authorizing the County of Monterey, through the Board of Supervisors, Planning Commission, Zoning Administrator, Minor Subdivision Committee, Subdivision Committee

or Director of Planning and Building Inspection, acting pursuant to this Title, to exercise its power to grant or deny a permit in a manner which will take or damage private property for public use without the payment of just compensation therefore."

The Commission claims that section 30010 and section 20.02.040 of the Coastal Zoning Ordinance generally authorize it to approve non-resource-dependent uses in habitat areas where doing so is necessary to avoid an unconstitutional taking.

We agree that these provisions establish a narrow exception to strict compliance with restrictions on uses in habitat areas based on constitutional considerations. Thus, where a restriction would require the denial of a permit, and the denial would, in turn, deprive an owner of the economic benefit or productive use of his or her land, the Commission theoretically has two options: deny the permit and pay just compensation; or grant the permit with conditions that mitigate the impacts that limitations were designed to prevent. However, because, as one commentary has observed, "the Commission is not authorized to purchase property, it has instead determined to limit application of the resource protection policies to the extent necessary to allow a property owner a constitutionally reasonable economic use of his or her property." (4 Manaster & Selmi, *supra*, § 66.57, p. 66-96, fn. omitted.)

According to the Commission, that is what it did here. Noting that the Project is in an area zoned for residential use, the Commission claims that "[i]mplicit in [its approval of the Project] is the understanding that denial of residential use of the property on the ground that it is not a resource-dependent use will result in a finding that the owner has been deprived of all beneficial use of the property, a result that the Coastal Commission must avoid under both the Coastal Act and the [habitat area]." Thus, to avoid a taking, the Commission relaxed the restriction and approved the Project with conditions that mitigate impacts on the habitat areas to a level of insignificance.

We agree that strict application of the resource-dependent-use restriction would require denial of the permit. Moreover, it may well be that the denial of a permit would effect an unconstitutional taking.[11] However, although the Commission's approval of the Project may appear to be consistent with an effort to avoid a taking, the record does not support a finding that the Commission approved the Project for that purpose; nor does the record show that the Commission properly did so.

Given the significance of relaxing a fundamental restriction on development in declared habitat areas and allowing a non-resource-dependent use,

---

[11] We do not intend to suggest that denial of a permit would or would not cause a taking.

one would expect the record to reflect some discussion of both the restriction and the taking issue. As the commentary quoted above observed, "Thus far, the Commission's use of [section] 30010 has been exclusively to allow single-family homes. It has supported this application of [section] 30010 with findings that the property was purchased with the expectation of residential use, that such expectation was reasonable, that the investment was substantial, and that the proposed development was commensurate with the reasonable investment-backed expectations for the site." (4 Manaster & Selmi, *supra*, § 66.57, p. 66-96.)

Here, however, the record is silent. The various staff reports and the Commission's revised findings do not cite Big Sur Land Use Plan section 3.3 or Coastal Implementation Plan section 20.145.020.EE, both of which acknowledge the resource-dependent-use restriction and provide examples of permissible uses. Nor do they discuss whether the Project is a resource-dependent use or analyze whether strict application of the habitat areas policies would require denial of the permit. Nor were these issues formally raised at the de novo hearing. Under the circumstances, one cannot reasonably infer that the Commission considered the threshold question of whether the Project was a permissible—i.e., resource-dependent—use in the two habitat areas.

Moreover, the staff reports, the revised findings, and the briefing to the Commission did not discuss whether the denial of a permit based on the limitation would deprive Laube and Engel of economic benefit or productive use of their property and constitute a taking. Again, the record does not support an inference that the Commission considered that issue; nor does it support a finding that the Commission implicitly made the findings necessary to support a determination one way or the other. This is especially so because "[w]hether the owner has been denied substantially all economically viable use of the property is a factual inquiry that requires the analysis of such factors as the economic impact of the regulation, interference with the landowner's reasonable, investment-backed expectations and the character of the government action. [Citation.] The basis of the inquiry is the owner's entire property holdings at the time of the alleged taking, not just the adversely affected portion. [Citation.]" (*Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 193 [80 Cal.Rptr.2d 562]; see *Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 497 [94 L.Ed.2d 472, 107 S.Ct. 1232]; *Kaiser Aetna v. United States* (1979) 444 U.S. 164, 175 [62 L.Ed.2d 332, 100 S.Ct. 383].) Again, at the de novo hearing, there was no discussion of the factual issues related to a determination of whether denial of a permit would deprive Laube and Engel of the beneficial or productive use of their property.

The record's silence on these important issues is all the more telling because the Commission has a general duty to support a decision to grant or deny a permit with written findings. (§ 30604, subds. (a)–(c).); Regs., § 13096, subd. (a).) The purpose of requiring written findings is to record the grounds on which the decision of the Commission rests and thus render its legality reasonably and conveniently reviewable on appeal. (*Natural Resources Defense Council, Inc. v. California Coastal Zone Conservation Com.* (1976) 57 Cal.App.3d 76, 90 [129 Cal.Rptr. 57]; see *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) Without appropriate written findings, the trial court cannot properly perform its function in a proceeding for administrative mandate and determine whether the agency's decision is supported by its findings and its findings are supported by the evidence. (*La Costa, supra,* 101 Cal.App.4th at p. 814.) Clearly, the Commission had a duty to make express findings that it was excusing strict compliance with the development restriction to avoid a taking if that had been its reason for approving the Project.

Indeed, as noted, when the Commission encounters a conflict between different provisions of the Act—for example, between section 30240(a), limiting development in habitat areas to resource-dependent uses, and section 30010, prohibiting application of policies that would cause an unconstitutional taking—the Act requires the Commission to make findings that identify the conflict and explain how it has been resolved. (§ 30200, subd. (b); see § 30007.5.)

More specifically, section 20.02.060, subdivision A of the Coastal Zoning Ordinance prohibits the approval of permits that are inconsistent with the Monterey County Local Coastal Program. However, section 20.02.060, subdivision B of the Coastal Zoning Ordinance provides that an exception may be considered "if it is found that the strict application of the area land use plan policies and development standards of this ordinance denies all reasonable use of the subject property. *The exception may be granted only if the decision-making body is able to make the following findings*: [¶] a. that the parcel is otherwise undevelopable due to specific policies of the applicable land use plan and development standards of this ordinance, other than for reasons of public health and safety; [¶] b. that the grant of a coastal development permit would not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and land use designation in which the subject property is located; [¶] c. that the parcel is not located within the critical viewshed of Big Sur as defined in Section 20.145.020 and Section 20.145.030 and the Big Sur Land Use Plan; [¶] d. that any development being approved is the least environmentally damaging alternative project. In order to make this finding, the development shall be required to minimize development of structures and impervious surfaces to the amount needed to reduce environmental impacts to the

greatest extent possible and shall be required to locate the development on the least environmentally sensitive portion of the parcel; [¶] e. that any development being approved under these provisions shall be one of the 'allowable uses' as listed under the parcel's zoning classification and that it shall be appealable to the California Coastal Commission in all cases." (Italics added.)

The Commission did not make the findings required by the Coastal Act or the Coastal Zoning Ordinance. And, although its findings might satisfy some of those requirements, they do not satisfy them all, and the circumstances do not suggest that the Commission intended to do so. Indeed, neither the staff reports nor the Commission's revised findings mention section 20.02.060 of the Coastal Zoning Ordinance.

 Given the record before us, we do not find that the Commission properly excused nonconformance with the resource-dependent-use restriction to avoid an unconstitutional taking. Accordingly, the Commission's finding that the Project conforms to habitat policies, including that restriction, is not supported by substantial evidence. Since approval of the Project rests, in part, on that erroneous finding, it follows, and we conclude, that the Commission abused its discretion in approving the Project and granting the coastal development permit. Therefore, the approval cannot stand, and the matter must be remanded to the Commission for a new hearing at which it can consider the taking issue and make appropriate findings.

## VI. Additional Issues

Given our conclusion, we need not address McAllister's claims concerning the sufficiency of the evidence to support the Commission's other findings that the Project conformed to visual and scenic policies and water policies. Nor need we address McAllister's claims that the Commission violated procedural and substantive provisions of CEQA.

However, McAllister's claim concerning the Project's conformance with visual and scenic policies raises two purely legal issues, which we find appropriate to address for future guidance. In particular, McAllister claims that the Commission applied the wrong visual and scenic policies and used the wrong standard to determine conformance with them.

A. VISUAL AND SCENIC RESOURCE POLICIES

■ Under the Coastal Act, in determining whether to grant a coastal development permit, the Commission must consider and protect scenic and visual resources. (§ 30251.)[12]

In accordance with this mandate, the Big Sur Land Use Plan states that one of its objectives is the preservation of "scenic resources in perpetuity . . . ." (Big Sur Land Use Plan, § 3.2.1.) To achieve this objective, the Big Sur Land Use Plan makes its "Key Policy" the prohibition of "all future public or private development *visible* from Highway 1 and major public viewing areas (the critical viewshed) . . . ." (Big Sur Land Use Plan, § 3.2.1, italics added; see Coastal Implementation Plan, § 20.145.030.) To implement the "Key Policy," the Big Sur Land Use Plan requires an onsite investigation of all permit applications that includes staking and flagging the dimensions, height, and rooflines of proposed buildings to determine whether the proposed development will be visible. Visibility is based on what can be seen by "normal, unaided vision in any direction for any amount of time at any season." (Big Sur Land Use Plan, § 3.2.3.B.1; see Coastal Implementation Plan, § 20.145.030.A.1.a.)

As previously discussed, the Big Sur Land Use Plan creates an exemption from the "Key Policy" for the Rocky Point area, which is defined as "[e]xisting vacant residential parcels in the critical viewshed between Highway 1 and the sea, from (and including) the southernmost existing residential parcel on Rocky Point, *to the northernmost developed residential parcel on Kasler Point . . . .*"[13] (Big Sur Land Use Plan, § 3.2.5.F, italics added; see Coastal Implementation Plan, § 20.145.030.B.6.)

The visibility policies applicable to exemption areas are less stringent and do not prohibit visible development. Rather, they require that "the design and siting of structures . . . not detract from the natural beauty of the undeveloped skylines, ridgelines, and the shoreline" "[s]o that the visual continuity may remain undisturbed." (Big Sur Land Use Plan, § 3.2.4.A.1; see Coastal Implementation Plan, § 20.145.030.C.2.a.) They further require a permit

---

[12] Section 30251 provides, "The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas, to minimize the alteration of natural land forms, to be visually compatible with the character of surrounding areas, and, where feasible, to restore and enhance visual quality in visually degraded areas. New development in highly scenic areas such as those designated in the California Coastline Preservation and Recreation Plan prepared by the Department of Parks and Recreation and by local government shall be subordinate to the character of its setting."

[13] There are other exemptions for rural service centers, essential ranching structures, highway facilities, utilities, state park parking areas, Otter Cove, and coastal-dependent uses.

applicant to "consider the visual effects upon public views as well as the view and privacy of neighbors. The portion of a parcel least visible from public viewpoints will be considered the appropriate site for the location of new structures. New structures shall be located where existing topography or trees provide natural screening and shall not be sited on open hillsides or silhouetted ridges." (Big Sur Land Use Plan, § 3.2.4.A.2; see Coastal Implementation Plan, § 20.145.030.C.2.b ["Buildings shall be located so as to minimize their visual impact upon public views as well as the view and privacy of neighbors."].) Moreover, new development "should be subordinate and blend with its environment, using materials or colors that will achieve that effect." (Big Sur Land Use Plan, § 3.2.4.A.3; see Coastal Implementation Plan, § 20.145.030.C.2.c.)

Concerning the Rocky Point area in particular, the Big Sur Land Use Plan also requires, among other things, that driveways be as narrow as possible and encourages the use of berms "designed to minimize views of structures without blocking ocean vistas seen from Highway 1 . . . ." (Big Sur Land Use Plan, § 3.2.5.F; see Coastal Implementation Plan, § 20.145.030.C.2.a, c.)

### B. APPLICABILITY OF EXEMPTION AREA POLICIES

In its findings after the de novo hearing, the Commission explained that the only potentially visible part of the Project—a section of roof—would be situated on the southern parcel of the property, which, the Commission found, was in the Rocky Point area. Accordingly, the Commission applied the less restrictive exemption area policies to the Project.

McAllister contends that the exemption area policies were inapplicable. He notes that the Rocky Point area includes "the northernmost developed residential parcel on Kasler Point" (Big Sur Land Use Plan, § 3.2.5.F) and claims that this must mean the northernmost *legally* developed parcel. Under this interpretation, the southern parcel does not qualify because Sorensen developed the property in violation of a permit condition requiring consolidation of the two parcels. Thus, McAllister claims the Commission erred in applying exemption area policies to the Project.

■ The construction of County legislative enactments, including the County's definition of the Rocky Point area, presents a question of law. (*TG Oceanside, L.P. v. City of Oceanside* (2007) 156 Cal.App.4th 1355, 1374 [68 Cal.Rptr.3d 320]; *Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013, 1023 [35 Cal.Rptr.3d 487].) County enactments are interpreted under the same rules used to interpret statutory enactments. (*H.N. & Frances C. Berger Foundation v. City of Escondido* (2005) 127 Cal.App.4th 1, 12 [25 Cal.Rptr.3d 19]; *Department of Health Services v. Civil Service Com. (Murrell)* (1993) 17 Cal.App.4th 487, 494 [21 Cal.Rptr.2d 428].)

Initially, we observe that, by itself, the word "developed" does not imply a limitation to *legal* development. Rather, as it relates to land and land use, the plain meaning of "developed" is descriptive and signifies only that the condition or use of land has been changed, improved, or intensified. (E.g., Webster's 3d New Internat. Dict. (2002) p. 618 [generally "develop" means "to change the form of (a surface) by applying point by point to a specified surface"].)

With this in mind, we note that the Big Sur Land Use Plan does not define "developed," but it does define the closely related term "development" and states that "development" "shall be defined by Section 30106 of the California Coastal Act." (Big Sur Land Use Plan, Glossary.) Under section 30106, "development" is not restricted to legal development; rather "development" is simply defined to include "grading" and any "change in the density or intensity of use of land."[14] (Cf. Gov. Code, § 65927 [development generally means placing or building a structure, grading, extracting, mining, dredging, changing uses, density, or intensity]; Harb. & Nav. Code, § 7005 [" 'Develop' and 'development' includes without limitation the acquisition, construction, repair, leasing improvement or any combination thereof necessary to create or develop a harbor."].) Thus, "development" as used in the Big Sur Land Use Plan has a meaning consistent with the plain, ordinary meaning of the word "developed."

■ As a general rule, "similar words or phrases in statutes in pari materia [that is, dealing with the same subject matter] ordinarily will be given the same interpretation." (*In re Bittaker* (1997) 55 Cal.App.4th 1004, 1009 [64 Cal.Rptr.2d 679]; accord, *People v. Coker* (2004) 120 Cal.App.4th 581, 588 [15 Cal.Rptr.3d 553]; *Balasubramanian v. San Diego Community College Dist.* (2000) 80 Cal.App.4th 977, 988 [95 Cal.Rptr.2d 837]; e.g., *Bonner v. County of San Diego* (2006) 139 Cal.App.4th 1336, 1351 [44 Cal.Rptr.3d 116].) Given the definition of "development," and the use of the related terms "developed" and "development" in the Big Sur Land Use Plan, we infer that the County intended the term "developed" to have a meaning consistent with "development" unless otherwise specified. (E.g., *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 213 [46 Cal.Rptr.3d 73, 138 P.3d 220] [finding it unlikely that similar words in articles enacted at same time were intended to have different meanings].) ■ Thus, since the Big Sur Land Use Plan considers the grading of land and/or changes in the intensity or density of its use to be "development," it is reasonable to conclude that,

---

[14] Section 20.06.310 of the Coastal Zoning Ordinance provides, in relevant part, "Development means, on land, in or under water: [¶] . . . [¶] 3. grading, removing, dredging, mining, or extraction of any materials, including excavation and filling which requires environmental review pursuant to the Monterey County CEQA Guidelines. [¶] 4. change in the density or intensity of use of land . . . ."

where such development exists, the land has been "developed" within the meaning of the definition of the Rocky Point area.

We observe that if the County had intended to limit "developed" to "legally developed," it certainly knew how to do so because it used that very phrase to define "[e]xisting [d]evelopment" as "all projects *legally developed* as of December 31, 1976, or later if approved under a coastal development permit where such permit is required under law." (County Ords., tit. 20, Big Sur Land Use Plan, Glossary, italics added; cf., e.g., *People v. Garrett* (2001) 92 Cal.App.4th 1417, 1432 [112 Cal.Rptr.2d 643] [if Legislature had intended to limit term serious felony specific offenses, it knew how to do so because it had done so in other statutes]; see also *City of Ontario v. Superior Court* (1993) 12 Cal.App.4th 894, 902 [16 Cal.Rptr.2d 32] [courts must assume that Legislature knows how to create an exception if it wishes to do so].)

█ Moreover, under a correlative canon of statutory construction, "when *different* words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended." (*People v. Jones* (1988) 46 Cal.3d 585, 596 [250 Cal.Rptr. 635, 758 P.2d 1165]; e.g., *Zavala v. Board of Trustees* (1993) 16 Cal.App.4th 1755, 1762 [20 Cal.Rptr.2d 768].) Thus, here, the County's use of "developed" instead of "legally developed" in defining the Rocky Point area indicates that "developed" was intended to have an unrestricted meaning that simply reflected the fact that there was some "development" of the parcel.

Concerning the County's intent, we assume that it knew of Sorensen's proposed development on Kasler Point because it had granted him a permit. Sorensen then graded and added various fixtures to the southern parcel. Accordingly, years later, when the County drafted the Big Sur Land Use Plan, it had reason to know about the two parcels on Kasler Point, which make up most of it, and their condition of development. In electing to broadly describe the exception area to include "the northernmost developed residential parcel on Kasler Point," rather than limiting it to the northernmost *legally* developed parcel, the County manifested an intent to include at least the southern parcel, regardless of any prior permit violation by Sorensen. The County implicitly confirmed that intent when it later approved the Project. In granting a permit, the County expressly found that it was in the Rocky Point area.[15]

---

[15] We observe that the majority of grading and other work that Sorensen performed occurred on the southern parcel. However, it appears that there was some excavation on the northern parcel. Arguably, therefore, it too is within the exemption area. Even if this were the case, it is of no consequence here because it is undisputed that the part of the Project located on the northern parcel will not be visible.

As noted, the interpretation of the Big Sur Land Use Plan "is ultimately a judicial function." (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 290 [82 Cal.Rptr.2d 569].) However, the County's view that the Project is within the exemption area is entitled to some deference for a number of reasons. The County wrote the Big Sur Land Use Plan. When it considers permit applications within its administrative jurisdiction, it is routinely called upon to interpret the meaning of the Big Sur Land Use Plan and apply it. And as a result, it possesses familiarity with applicable legal and regulatory issues. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; e.g., *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219–220 [130 Cal.Rptr.2d 564].)

 Under the circumstances, we decline to rewrite the definition of the Rocky Point area to exclude the southern parcel. Indeed, a cardinal rule of statutory construction prohibits us from adding provisions to statutes that were not included by the Legislature. (Code Civ. Proc., § 1858 [a court must not "insert what has been omitted"]; *Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998 [275 Cal.Rptr. 201, 800 P.2d 557]; *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 125 [113 Cal.Rptr.2d 90].) Similarly, we must avoid adding language to a statute under the guise of construction to accomplish a purpose that does not appear on the face of the statute or from its legislative history. (*People v. Morris* (1988) 46 Cal.3d 1, 15 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543–544, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527]; *Bank of America v. Salinas Nissan, Inc.* (1989) 207 Cal.App.3d 260, 270 [254 Cal.Rptr. 748].)

Here, adding the term "legally" to the definition of the Rocky Point area would make it more restrictive, a purpose that does not appear on the face of the definition and is inconsistent with the unrestricted and unqualified language of the definition. (E.g., *Schneider v. California Coastal Com., supra*, 140 Cal.App.4th 1339, 1345 [rejecting the Commission's addition of terms to § 30251].) Moreover, although courts may add language to a statute in extreme cases where we are convinced the Legislature inadvertently failed to utilize the words that would give purpose to the legislation (*People v. Buena Vista Mines, Inc.* (1996) 48 Cal.App.4th 1030, 1034 [56 Cal.Rptr.2d 21]), we are not convinced that the County inadvertently omitted the word "legally" in its description of the exemption area but did not do so elsewhere in the Big Sur Land Use Plan.

Citing *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546] (*Avco*), *Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333 [125 Cal.Rptr.2d 140] (*Arviv*), and *Pettitt v. City of Fresno* (1973) 34 Cal.App.3d 813 [110 Cal. RPtr. 262] (*Pettitt*), McAllister argues that we must construe "developed" to mean "legally developed" in order to comply with the rule that "no vested development rights can accrue from illegal development."

McAllister's cases establish that when a developer starts a project without any permit or under an invalid permit—i.e., one that was issued in violation of existing zoning or environmental laws—the developer does not gain a vested right to complete the project; and, in the latter situation, the government is not estopped from challenging the validity of the permit even if the developers expended resources in reliance on it. (*Avco, supra,* 17 Cal.3d at pp. 791–798 [initial construction without a permit did not give developer a vested right to complete the work]; *Arviv, supra,* 101 Cal.App.4th at pp. 1348–1350 [existing permits for certain development did not create vested right to proceed with additional, unpermitted development]; *Pettitt, supra,* 34 Cal.App.3d at pp. 818–824 [use permit issued in violation of zoning ordinance did not create vested right to maintain the permitted use].)

The circumstances here are much different and distinguishable from McAllister's cases. Sorensen properly obtained a permit that authorized the work he performed. However, he violated a permit condition by failing to consolidate the two parcels. Later, he abandoned his project, his permit expired, and he sold the property.

Moreover, insofar as the cases suggest that Sorensen's violation prevented Laube and Engel from obtaining vested rights under *Sorensen's* permit, the cases are irrelevant. Laube and Engel do not claim that they have a vested right to build a house *under Sorensen's permit*. Rather, they sought and were granted their own permit. In any event, the issue here is not whether Laube and Engel somehow gained vested rights under Sorensen's permit; the issue is the meaning and scope of the definition of the Rocky Point area. McAllister's cases do not suggest that our interpretation is erroneous or unreasonable.

McAllister argues that our interpretation would reward Laube and Engel "for their predecessor's illegal conduct by applying potentially less protective viewshed standards based on the illegal Sorensen Development. . . ." We are not persuaded.

Again, Sorensen's "illegal conduct" was that he performed otherwise authorized work on the property but failed to consolidate the two parcels as required. (See Coastal Zoning Ord., § 20.90.050.) We point out that, as a condition of their permit, Laube and Engel were required to consolidate the two parcels. According to the County, consolidation will "reduce the number of remaining vacant parcels in the Rocky Point area, thereby easing cumulative problems of finding options to place structures outside of the public viewshed." The County also required a "Conservation and Scenic Easement" around the proposed building pad to protect environmentally sensitive habitat. Thus, far from rewarding Laube and Engel for Sorensen's violation, they were required to cure it.

In his reply brief, McAllister notes that the Commission has only a limited ability to monitor and enforce permit conditions. (See *Feduniak, supra,* 148 Cal.App.4th at p. 1363 [discussing practical limitations on monitoring capability].) He argues that our interpretation will give future permittees "an incentive to violate permit conditions, as they will be comforted with the knowledge that any violation can simply be addressed by a subsequent permit application." Consequently, McAllister invites us to "send . . . a clear message that such machinations are inconsistent with the purposes of the Coastal Act and the [Monterey County Local Coastal Program], and therefore cannot be tolerated."

The Rocky Point area is a small part of the Big Sur coastal area, and our interpretation affects only a small part of the exception area: Kasler Point. Indeed, in practical effect, it applies to only one parcel. Although we agree in general that permittees should not be encouraged to disregard permit conditions, McAllister's "sky is falling" argument grossly exaggerates the potential consequences of our interpretation.

In sum, we conclude that the Commission did not err in finding the southern parcel to be within the Rocky Point area and reviewing the Project under the less restrictive visibility policies applicable to that exemption area.

### C. APPLICATION OF EXEMPTION AREA POLICIES

McAllister contends that, even if exemption area policies apply, the Commission erred as a matter of law in finding conformance with them. He first claims that the Commission impermissibly amended the Big Sur Land

Use Plan exemption area requirements to allow a finding of conformance without public notice or a hearing. He next claims the Commission used an erroneous standard to determine conformance.

### 1. AMENDING THE BIG SUR LAND USE PLAN

To help explain McAllister's "improper amendment" claim, we first review some procedural history. As noted, after the County approved the Project, McAllister appealed to the Commission, and, after the Commission determined that the appeal raised a "substantial issue" concerning whether the Project conformed to applicable development policies, the Commission scheduled a de novo hearing on the permit application. (§ 30625, subd. (b)(2); see Regs., § 13115, subd. (b).)

The record reveals that in its report for the initial "substantial issue" determination, staff explained, among other things, that the Project would be visible from Highway 1, and the County had not required a reduction in size to "minimize" its visibility, as required by exemption area policies. Noting that, previously, a 4,000-square-foot house had been approved that would not have been visible, staff asserted that there was no justification to approve a much larger *visible* house when measures could be taken to completely conceal it. Accordingly, staff opined that the Project, as approved by the County, did not conform to exception area policies concerning a number of resources, including scenic resources, and recommended that the Commission find that the appeal raised a "substantial issue" concerning conformance with the Big Sur Land use Plan.[16] (Regs., § 13115, subd. (a) [director must make recommendation].)

In its report for the de novo hearing, staff asserted that the visibility policies for the Rocky Point area required that the Project be entirely concealed if feasible. The report noted that after the "substantial issue" determination, the Project had been redesigned to reduce its visibility. However, staff concluded that a small part of the roof would still be visible. Because it was feasible to eliminate visibility by further reducing the size of the house, staff recommended that the Commission find that the Project, as designed, did not conform to exception area policies; and impose a permit condition that required Laube and Engel to redesign the Project so that "no portion of the structure will be visible from public viewing areas . . . ."

---

[16] The staff report also recommended a finding that the appeal raised a "substantial issue" concerning conformance with policies for the protection of habitat areas and water resources and the prevention of geological hazards.

As noted, at the de novo hearing, the Commission rejected the proposed findings and recommended condition and voted to approve the Project as redesigned. Thereafter, staff revised the previously proposed findings and recommended condition in the staff report to reflect the Commission's action, and, after a hearing on May 11, 2005, the Commission adopted the revised findings. (See Regs., § 13096, subd. (b).)

In its revised findings, the Commission noted that staff had staked and flagged the Project; then, using binoculars, staff had been able to locate the staking from public viewpoints on Highway 1 both north and south of the site; and then, without binoculars, staff had been able to see the staking. According to the Commission, however, there was conflicting evidence concerning whether the Project would be visible to the naked eye. The Commission noted certain testimony, photographs, and an inspection by one commissioner, who reported that the staking was not visible.

The Commission found it unnecessary to resolve the apparent conflict and made no finding whether or not the roof of the house would be visible. Instead, the Commission concluded that any potential visibility and visual impact had been "minimized."

The Commission found that "[i]f some small portion of the project will be visible from one or more public viewpoints, the topography of the site almost entirely screens the proposed structure from public views and the structure would be located on the portion of the site that is least visible to the public. Although the roof will somewhat extend above the topography, the verdigris color of the roof will blend with the nearby vegetation. Thus the Commission finds that to the extent any portion of the structure would be visible, it is insignificant and its effect on the viewshed would be negligible in this specific context. It will be subordinate to and blend [into] its environment. The Commission also finds that as currently proposed, any blockage of ocean vistas would be insignificant. The Commission further finds that redesigning the proposed structure to reduce the square footage would make only a negligible difference to the visibility of the structure and is not necessary to bring the structure into conformity with the [Monterey County Local Coastal Program]." Under the circumstances, the Commission concluded that the Project conformed to exception area policies requiring that visibility and visual impacts be minimized.

McAllister asserts that when it initially found that his appeal from the County's decision raised a "substantial issue" concerning whether the Project conformed to visibility policies, the Commission adopted, in essence, an invisibility-if-feasible standard. He notes, however, that at the de novo hearing, the Commission applied a less restrictive standard that allowed

insignificant and negligible visibility, even if it was feasible to modify the Project to eliminate all visibility. McAllister claims that, in changing its prior, more restrictive standard, the Commission effectively amended the exemption area policies; and, in doing so without notice or a hearing, the Commission abused its discretion. (§§ 30512–30514 [requiring notice and a hearing for certification of habitat area and subsequent amendments].) We disagree.

We acknowledge that because the Commission adopted the staff recommendation that McAllister's appeal raised a "substantial issue," the Commission's action is "deemed to have been taken on the basis of, and to have adopted, the reasons, findings and conclusions set forth in the staff report . . . ." (Regs., § 13096, subd. (b).) However, even if we assume that the staff report applied, and the Commission implicitly adopted, an invisibility-if-feasible standard, we reject McAllister's claim that the Commission later amended the Big Sur Land Use Plan when it applied a less restrictive standard at the de novo hearing.

First, the "substantial issue" determination was not designed or intended to have any substantive effect on the nature of the Project or to guide the Commission's subsequent action. Rather, the purpose of that initial determination was simply to establish the Commission's jurisdiction to consider the permit application de novo. Given that limited procedural purpose and function of that determination, we do not believe that the standard used to make it must necessarily be applied at the subsequent de novo hearing. This is especially so here because the "substantial issue" determination was based on numerous grounds, any one of which provided a reason for the Commission to accept jurisdiction. Moreover, after the "substantial issue" determination, the Project was redesigned to further minimize its visibility. Thus, the factual analysis of the Project's visibility in the initial staff report became obsolete and irrelevant in determining whether the Project as redesigned conformed to exemption area policies.

Furthermore, McAllister cites no authority for the proposition that after the Commission makes a "substantial issue" determination, the standards it applied become binding, and the Commission is prohibited or estopped from reconsidering the proper standards at the de novo hearing. We can think of no policy reason that would warrant or justify such a restriction. Indeed, if the Commission applied the wrong standard in making the "substantial issue" determination, such a rule would require that the Commission repeat it at the de novo hearing, which, in turn, would undermine the validity of its decision and provide a legal basis to challenge it that easily could have been avoided.

We observe that after the "substantial issue" determination, the staff report for the de novo hearing explicitly adopted an invisibility-if-feasible standard

of conformance with exception area policies. However, the Commission was not required to adopt the staff's view of the applicable standard because the Commission, not staff, is ultimately responsible for interpreting and applying the Big Sur Land Use Plan. Consequently, the Commission was free to accept or reject the analyses and recommendations in a staff report. (*Ocean Harbor House Homeowners Assn. v. California Coastal Com.* (2008) 163 Cal.App.4th 215, 225, fn. 6 [77 Cal.Rptr.3d 432] [recognizing that decisions of the Commission may be " 'different than those proposed by the staff in the staff recommendation' "]; *Benson v. California Coastal Com.* (2006) 139 Cal.App.4th 348, 354 [42 Cal.Rptr.3d 580] [staff recommendation not "binding" on Commission]; see Regs., § 13090, subd. (d).)

Finally, we reject McAllister's claim that adopting a different standard at the de novo hearing impermissibly amended the Big Sur Land Use Plan without providing notice or an opportunity to be heard.

██ " '[T]he Commission in approving or disapproving a[] [habitat area] does not create or originate any land use rules and regulations. It can approve or disapprove but it cannot itself draft any part of the coastal plan.' " (*Yost v. Thomas, supra,* 36 Cal.3d at p. 572, quoting *City of Chula Vista v. Superior Court* (1982) 133 Cal.App.3d 472, 488 [183 Cal.Rptr. 909]; see § 30514, subds. (a), (b); *Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 410–411 [71 Cal.Rptr.3d 522]; *Douda v. California Coastal Com.* (2008) 159 Cal.App.4th 1181, 1192 [72 Cal.Rptr.3d 98]; *Conway v. City of Imperial Beach* (1997) 52 Cal.App.4th 78, 86 [60 Cal.Rptr.2d 402].) Moreover, when the Commission considers an application for a coastal development permit, it is acting in an adjudicatory or quasi-judicial capacity and simply applies existing rules to a specific set of facts. (*Patterson v. Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 841 [130 Cal.Rptr. 169].) Although the application of rules—in this case the Big Sur Land Use Plan policies—may at times require the Commission to interpret their meaning, by no stretch of the imagination can those interpretations be considered amendments to the Big Sur Land Use Plan; rather the Commission's interpretations are simply its legal opinions, subject to independent judicial review. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 11.)

Moreover, interpreting legislative acts, including the County's exemption area policies, involves a question of law. Thus, when, in granting or denying a permit, the Commission adopts an interpretation different from one it had previously applied, the new interpretation does not represent the sort of fact-based determination or policy decision for which notice and an opportunity to comment is necessary or appropriate. In determining the meaning of exemption area policies, one looks at the language and legislative intent. The current views of the public are irrelevant.

In short, if applying a new interpretation of the exemption area policies constituted an abuse of discretion, it did so not because that interpretation amended the Big Sur Land Use Plan without notice or a hearing but because the interpretation was erroneous, and, therefore, the Commission failed to proceed in the manner required by law. (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 355 [46 Cal.Rptr.3d 355, 138 P.3d 692] [application of erroneous legal standard constitutes failure to proceed in manner required by law and an abuse of discretion]; *La Costa, supra*, 101 Cal.App.4th at p. 814.) Thus, we focus on whether the Commission properly interpreted the Rocky Point area policies.

## 2. STANDARD OF CONFORMANCE WITH EXEMPTION AREA POLICIES

McAllister asserts that the exemption area policies require that all feasible measures be taken to "minimize" the visibility and visual impact of a new development. Citing a dictionary definition of "minimize"—i.e., to reduce to the least degree possible—he asserts that the policies require that visibility and visual impacts be reduced to the least degree possible. Noting that zero is the least degree of anything, McAllister reasons that the exemption area policies require the reduction of visibility and impacts to zero if that is reasonably feasible. Thus, McAllister reiterates the view of staff that conformance with exemption area policies is measured against an invisibility-if-feasible standard.[17]

The exemption area policies do not directly and expressly require that visibility be "minimized." However, that is the approach taken by the Commission. Moreover, the Big Sur Land Use Plan does use the word "minimize" in specific sections. It requires the selection of building sites "to avoid the construction of visible access roads and *minimize* the extent of environmental and engineering problems resulting from road construction." (Big Sur Land Use Plan, § 3.2.4.A.5, italics added.) It requires "the use of berming and other measures designed to *minimize* views of structures without blocking ocean vistas seen from Highway 1 . . . ."[18] (Big Sur Land Use Plan, § 3.2.5.F, italics added.)

---

[17] McAllister claims that because the Commission applied different standards at the "substantial issue" determination and the de novo hearing, the latter, less restrictive interpretation is not entitled to any deference by this court. However, by the same reasoning, we should not give any deference to its initial, more restrictive interpretation.

In any event, we note that, in approving the Project, the County implicitly interpreted the exemption area policies to require only that visibility be mitigated to a level of insignificance. Thus, even if the Commission's final interpretation is not entitled to any deference, the County's similar interpretation is. (See discussion, *ante*, at pp. 946–947.)

[18] In addition, section 20.145.030.C.2.b of the Coastal Implementation Plan provides that buildings "shall be located so as to minimize their visual impact upon public views as well as the view and privacy of neighbors. New structures shall be located on that portion of a parcel least visible from public viewpoints." Section 20.145.030.C.2.e of the Coastal Implementation

Other provisions imply minimization of visibility and impacts. For example, one provides that the siting of structures "shall not detract from the natural beauty of the undeveloped skylines, ridgelines, and the shoreline." (Big Sur Land Use Plan, § 3.2.4.A.1.) Another provides that the "portion of a parcel least visible from public viewpoints" shall be considered the most "appropriate site" for new structures. (Big Sur Land Use Plan, § 3.2.4.A.2.) Another provides that development should be "subordinate and blend with its environment . . . ." (Big Sur Land Use Plan, § 3.2.4.A.3.)

 Given these provisions, we agree that, collectively, the exemption area policies require that visibility and visual impacts be minimized. We further agree with McAllister that to minimize means to reduce something to the least number, size, amount, extent, or degree of it possible.[19] However, we reject McAllister's "logic" in extending the meaning of "minimize" to the total elimination of something if feasible. The plain meaning and ordinary understanding of "minimize" is to reduce, not eliminate. Thus, when one says that something has been "minimized," people do not ordinarily understand that the thing has been completely eliminated but expect to find some residue or remainder. Conversely, if something has been completely eliminated, one would not usually say that it had been minimized.

With this common understanding of "minimize" in mind, we observe that if the County had wanted to impose an invisibility-if-feasible standard in the exception area, it knew how to use words that would clearly and explicitly reflect that intent and directly achieve that purpose. For example, section 3.2.6.3 of the Big Sur Land Use Plan provides, "Where no other *feasible mitigation measures for eliminating* the adverse visual impacts of new development in the critical viewshed are available" (italics added), the County may establish a system of transfer development credits, under which a property owner can increase the intensity of development on a parcel outside the critical viewshed where visual restrictions bar development of a parcel in the critical viewshed. This section directly and unambiguously creates an elimination-if-feasible standard for property subject to strict policies in the critical viewshed.

Given this section, we doubt that, in the closely related provisions concerning exemption areas, the County would have required only that visibility be

---

Plan provides that new structures "shall be sited to avoid the construction of visible access roads and minimize the extent of environmental problems engineering resulting from road construction."

[19] See, e.g., Webster's 3d New International Dictionary, *supra*, at page 1438, defining "minimize" as "to reduce to the smallest possible number, degree, or extent."

minimized if its intent and goal had been to require invisibility if reasonably feasible. We reiterate the rule that the use of specific language in one provision, and the use of different language in a related provision indicates that the County intended different meanings in each provision. (*People v. Jones, supra*, 46 Cal.3d at p. 596; e.g., *Zavala v. Board of Trustees, supra*, 16 Cal.App.4th at p. 1762.)

We also infer that in creating an exemption to the "Key Policy" prohibiting any visible development (absolute invisibility), the County intended to do just that: create an *exception* that tolerated some visibility in the Rocky Point area that was insignificant. However, an invisibility-if-feasible standard would, as the Commission persuasively argues, effectively extend the "Key Policy" prohibiting any visibility to the exemption area because, as a practical matter, it is always feasible to redesign a project by reducing its size and/or lowering its base to completely eliminate its visibility and impact.

Finally, we note that in requiring that visibility and visual impacts be minimized, the Commission applied a more restrictive standard than the definition of "minimize" would otherwise suggest. The Commission required that visibility and impacts be reduced not just to the least amount possible under the circumstances but to the level of insignificance and negligibility. In our view, that standard is fully consistent with both the purpose of the "Key Policy" to protect visual and scenic resources and the County's intent in creating an exception to the "Key Policy."[20]

In sum, we conclude the Commission properly declined to apply the invisibility-if-feasible standard adopted by staff and its report correctly focused on whether the visibility and visual impact of the Project had been sufficiently minimized to the level of insignificance and negligibility, that is, whether the Project significantly detracted from or disturbed the natural beauty and continuity of the undeveloped skyline, ridgeline, and shoreline, and was subordinate to and blended in with the surrounding environment.

---

[20] McAllister suggests that even if the exception area policies permit some visibility, they nevertheless prohibit visible development that would block ocean vistas. The policies require that development be designed and sited so that it does not "detract from the natural beauty of the undeveloped skylines, ridgelines, and the shoreline" and "[s]o that the visual continuity may remain undisturbed." (Big Sur Land Use Plan, § 3.2.4.A.1.) The prohibition against blocking ocean vistas, however, appears only in connection with the policy encouraging the use of berms to further minimize visibility. (Big Sur Land Use Plan, § 3.2.5.F.) It is the berms that must not block ocean vistas.

## VII. Disposition

The judgment is reversed. The matter is remanded, and the trial court is directed to issue a writ of mandate reversing the Commission's determination to approve the Project and remanding the matter for a new hearing on the permit application.

McAllister is entitled to his costs on appeal. (Cal. Rules of Court, rule 8.278.)

Premo, J., and Elia, J., concurred.

On January 20, 2009, the opinion was modified to read as printed above.